**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| WILLIAM WYNNE, | : | |
| ADMINISTRATOR OF THE ESTATE | : | |
| OF ANDREW LENETIS | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:20-CV-01834 (JCH) |
| v. | : | |
| | : | |
| TOWN OF EAST HARTFORD, | : | |
| KEVIN BEEMAN | : | |
| KWANZA CLAYTON | : | |
| Defendants. | : | NOVEMBER 7, 2023 |


**RULING ON MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 141, 147, 148, 159) AND MOTION TO PRECLUDE PLAINTIFF'S EXPERTS (DOC. NO. 153)**

TABLE OF CONTENTS

I.   INTRODUCTION                                                                     3
II.  BACKGROUND                                                                       4
    A.   Factual Background                                                           4
        1.   Mr. Lenetis' Encounter with East Hartford Police                        4
        2.   Mr. Lenetis' Transportation to and Treatment at Saint Francis           9
        3.   Training Officers Beeman and Clayton Received                           12
    B.   Procedural Background                                                        14
III. LEGAL STANDARD                                                                   16
    A.   Motion for Summary Judgment                                                  16
    B.   Motion to Preclude                                                           17
        1.   Qualifications                                                           18
        2.   Reliability                                                             18
        3.   Relevance                                                               20
IV.  DISCUSSION                                                                       21
    A.   Defendants' Motion for Summary Judgment (Doc. No. 159)                       21
        1.   Counts One and Two: Title II of the ADA and the Rehabilitation Act      21
        2.   Count Six: Monell Liability Under Section 1983                          31
        3.   Counts Three, Four, and Seven: Wrongful Death (Negligence)              38
        4.   Count Five: Connecticut Constitution                                    43

|   | 5. | Count Eight: Indemnification | 45 |
|---|---|---|---|
|   | 6. | Conclusion | 46 |
| B. | | Plaintiff and Apportionment Defendants' Motions for Summary Judgment (Doc. Nos. 141, 147, 148) | 46 |
|   | 1. | Gross or Obvious Negligence | 48 |
|   | 2. | Expert Testimony | 52 |
| C. | | Motion to Preclude Expert Testimony (Doc. No. 153) | 59 |
|   | 1. | Testimony of Kathleen Flaherty | 59 |
|   | 2. | Testimony of Roger Clark | 64 |
| V. | CONCLUSION | | 67 |

I.      **INTRODUCTION**

Plaintiff William Wynne ("Mr. Wynne"), Administrator of the Estate of decedent Andrew Lenetis ("Mr. Lenetis"), brings this action under Title II of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("Rehabilitation Act"), section 1983 of title 42 of the United States Code ("section 1983"), and Connecticut state law against defendants the Town of East Hartford, Officer Kevin Beeman ("Officer Beeman"), and Officer Kwanza Clayton ("Officer Clayton").  In turn, the defendants have filed an Apportionment Complaint (Doc. No. 25) seeking to allocate liability to apportionment defendants emergency medical technician ("EMT") Philip Zetterstrom ("Mr. Zetterstrom"); EMT Rebecca Vest ("Ms. Vest"); Ambulance Service of Manchester, LLC ("the Ambulance Service"); and Saint Francis Hospital and Medical Center ("Saint Francis") (collectively, "Apportionment Defendants").

This case arises out of the death of Mr. Lenetis, which was precipitated by a serious brain injury.  The various parties dispute the cause of and entities responsible for Mr. Lenetis' death.

Now before the court are several Motions for Summary Judgment (Docs. No. 141, 147, 148, 159), including a Motion filed by Mr. Wynne ("Wynne's Mot. for Summ. J.") (Doc. No. 141); one by Saint Francis Hospital ("St. Francis' Mot. for Summ. J.") (Doc. No. 147); another by the Ambulance Service, Mr. Zetterstrom, and Ms. Vest ("Ambulance Serv.'s Mot. for Summ. J.") (Doc. No. 148); and a final Motion by East Hartford and Officers Beeman and Clayton ("E. Hartford's Mot. for. Summ. J.") (Doc. No. 159); as well as a Motion to Preclude Plaintiff's Experts ("E. Hartford's Mot. to Preclude Experts") (Doc. No. 153).  For the reasons set forth below, the Motion for

Summary Judgment by the Town of East Hartford and Officers Beeman and Clayton is denied; the Motions for Summary Judgment by Mr. Wynne, the Ambulance Service, Mr. Zetterstrom, Ms. Vest, and Saint Francis are granted; and the Motion to Preclude is granted in part and denied in part.

## II.    BACKGROUND

### A.    Factual Background[1]

#### 1.    Mr. Lenetis' Encounter with East Hartford Police

At approximately 2:09 p.m. on November 1, 2019, East Hartford Police were dispatched to conduct a welfare check on Andrew Lenetis at the Heritage Garden Apartments.  See Plaintiff's Local Rule 56(a)2 Statement of Facts ("Pl.'s 56(a)2 Stmt.") ¶ 1 (Doc. No. 166-1); Defendants' Local Rule 56(a)1 Statement of Facts ("Defs.' 56(a)1 Stmt.") ¶ 1 (Doc. No. 159–2); 911 Call Transcript, Defs.' Ex. G, at 1 (Doc. No. 159-10). Heritage Garden Apartments is run by InterCommunity, Inc., which provides behavioral health and addiction recovery services, and the apartment complex houses members of the East Hartford community with mental health disabilities.  Pl.'s 56(a)2 Stmt. ¶ 2; Defs.' 56(a)1 Stmt. ¶ 2.  Each resident is assigned a case worker, but the apartment complex is not a locked or secure facility.  Pl.'s 56(a)2 Stmt. ¶ 3; Defs.' 56(a)1 Stmt. ¶ 3.

The police were summoned to the complex in response to a 911 call by Johnnie Gladstone, an employee of InterCommunity, Inc. and a supervisor of its Community Foundations program.  Pl.'s 56(a)2 Stmt. ¶¶ 5-6; Defs.' 56(a)1 Stmt. ¶¶ 5-6.  At the time she placed the call to 911, Ms. Gladstone believed that she and the residents of the

---

[1] The court draws primarily from the parties' Local Rule 56(a) statements and supporting exhibits in summarizing the material facts.  As it must, the court construes all disputed facts in the light most favorable to the non-moving party.  It does note where the parties disagree as to what happened.

complex faced an imminent threat of harm.  January 27, 2022 Deposition of Johnnie Gladstone ("Defs.' Gladstone Dep. Tr."), Defs.' Ex. E, at 92:5-92:8 (Doc. No. 159-8); Defs.' 56(a)1 Stmt. ¶ 12.[2]

According to the 911 call, Mr. Lenetis was "knocking on glass" and had stabbed pumpkins with "two knives."  911 Call Transcript at 1; Pl.'s 56(a)2 Stmt. ¶ 6; Defs.' 56(a)1 Stmt. ¶ 6; see also January 27, 2022 Deposition of Johnnie Gladstone ("Pl.'s Gladstone Dep. Tr."), Pl.'s Ex. 3, at 84:2-84:11 (Doc. No. 166-6) (describing the knives Mr. Lenetis was seen with as "pocketknives").  Ms. Gladstone remained on the phone with 911 until police arrived, providing updates on Mr. Lenetis' location as he sat in the community room with a 40-ounce beer, went outside to the front of the building, and then went back inside and began throwing chairs.  Pl.'s 56(a)2 Stmt. ¶¶ 8-10; Defs.' 56(a)1 Stmt. ¶¶ 8-10.

Dispatch informed the officers who arrived at the Heritage Garden Apartments that Mr. Lenetis was previously seen outside stabbing pumpkins with knives—and that he still had the knives in his pockets—but that he had since moved inside the building, where he initially threw one or two chairs around the lobby of the complex.  Pl.'s 56(a)2 Stmt. ¶¶ 13-14; Defs.' 56(a)1 Stmt. ¶¶ 13-14.  Officer Clayton, the first officer to arrive at Heritage Garden, spoke with Ms. Gladstone about what had just transpired.  Pl.'s 56(a)2 Stmt. ¶¶ 15, 18; Defs.' Stmt. 56(a)1 ¶¶ 15, 18.  When Officer Beeman arrived at the complex, Officer Clayton brought him up to speed.  See Officer Kevin Beeman's

---

[2] Plaintiff's Local Rule 56(a)2 Statement admits that Ms. Gladstone testified to this, but denies that Mr. Lenetis actually posed an imminent threat of harm to those at the complex.  Pl.'s 56(a)2 Stmt. ¶ 12.  However, the statement of fact posits only that, "when [Ms.] Gladstone called the 911 emergency line, she considered the other occupants of the building as well as herself to be in imminent harm."  Defs.' 56(a)1 Stmt. ¶ 12.  The transcript of Ms. Gladstone's deposition clearly supports this proposition, so the material fact is deemed admitted.  See D. Conn. L. Civ. R. 56(a)(2)(i)–(3).

October 21, 2021 Deposition Transcript ("Defs.' Officer Beeman Dep. Tr."), Defs.' Ex. D, at 118:6-119:17 (Doc. No. 159-7).

Officer Clayton proceeded to ask Ms. Gladstone where Mr. Lenetis resided and, with the help of Kayla Orozco, a Community Foundations Case Manager, Ms. Gladstone ushered the officers to Mr. Lenetis' room.  Pl.'s 56(a)2 Stmt. ¶¶ 20, 22; Defs.' 56(a)1 Stmt. ¶¶ 20, 22.  As they walked to the room, Ms. Gladstone believes she informed the officers that Mr. Lenetis was off his medications[3] and was diagnosed with schizophrenia.  Pl.'s 56(a)2 Stmt. ¶ 23; Defs.' 56(a)1 Stmt. ¶ 23; Pl.'s Gladstone Dep. Tr. at 71:13-71:15.  While Officer Clayton suggested that he does not recall Ms. Gladstone notifying the officers of this information, he assumed that Mr. Lenetis lived at Heritage Garden as a result of a mental health disability.  Officer Kwanza Clayton's November 1, 2021 Deposition Transcript ("Defs.' Officer Clayton Dep. Tr."), Defs.' Ex. B, at 79:6-79:21 (Doc. No. 159-5).  Officer Beeman, however, suggested that no one informed him that Mr. Lenetis had a mental health disability of any kind.  See Defs.' Officer Beeman Dep. Tr. at 50:13-51:2.

Upon arrival at Mr. Lenetis' door, the officers asked Ms. Gladstone to leave to ensure she "could be safe."  Pl.'s 56(a)2 Stmt. ¶ 28; Defs.' 56(a)1 Stmt. ¶ 28.[4]  It is

---

[3] The parties agree that, although Mr. Lenetis was off his medication, InterCommunity staff could not force him to take his medication or participate in services until he reached the point where an involuntary examination and care was available under Connecticut law.  Pl.'s 56(a)2 Stmt. ¶ 63; Defs.' 56(a)1 Stmt. ¶ 63.  However, the parties disagree as to how long before the incident Mr. Lenetis ceased taking his medication.  Pl.'s 56(a)2 Stmt. ¶ 60; Defs.' 56(a)1 Stmt. ¶ 60.

[4] Plaintiff's Local Rule 56(a)2 Statement admits that police told Ms. Gladstone to leave to ensure her safety but denies that Ms. Gladstone actually needed to leave in order to be safe.  Pl.'s 56(a)2 Stmt. ¶ 28.  Again, though, the statement of fact suggests only that, "the officers told Johnnie Gladstone to leave so that she 'could be safe.'"  Defs.' 56(a)1 Stmt. ¶ 28.  Ms. Gladstone's deposition directly supports this assertion, so the material fact is deemed admitted.  See D. Conn. L. Civ. R. 56(a)(2)(i)-(3).

disputed whether the officers had time to wait for a Crisis Intervention Team "CIT" officer to show up—CIT Officer Jason Hawley ("Officer Hawley") arrived on the scene just two minutes after officers Beeman and Clayton.  See Officer Kwanza Clayton's November 1, 2021 Deposition Transcript ("Pl.'s Officer Clayton Dep. Tr."), Pl.'s Ex. 4, at 33:2-33:11 (Doc. No. 166-7); Pl.'s 56(a)2 Stmt. ¶ 31; Defs.' 56(a)1 Stmt. ¶ 31.

Consistent with their training, the officers proceeded to knock on and then step to the sides of Mr. Lenetis' door.  Pl.'s 56(a)2 Stmt. ¶ 29; Defs.' 56(a)1 Stmt. ¶ 29.  Mr. Lenetis "opened the door pretty quickly", Defs.' Officer Clayton Dep. Tr. at 89:9, and "walked right out", id. at 89:22.  Before engaging in conversation with Mr. Lenetis, the officers immediately grabbed his arms and attempted to handcuff him.  See id. at 91:3-91:23.  The officers' stated purpose for doing so was to "make sure [Mr. Lenetis] didn't have anything on him, knives, weapons", id. at 91:21-91:23, though they saw that he had nothing in his hands, id. at 91:13-91:15.

The parties disagree as to what occurred next.[5]  They dispute whether Mr. Lenetis attempted to walk away or officers quickly shoved him against the hallway wall on their own.  Pl.'s 56(a)2 Stmt. ¶ 38; Defs.' 56(a)1 Stmt. ¶ 38.  The parties also disagree about whether Mr. Lenetis was intentionally thrown to the ground thereafter.  Pl.'s 56(a)2 Stmt. ¶¶ 39-41; Defs.' 56(a)1 Stmt. ¶¶ 39-41.  When he was deposed, Officer Clayton said that Mr. Lenetis took a few additional steps before Officer Clayton tripped and fell on top of Mr. Lenetis, bringing both men to the ground.  See Defs.'

---

[5]  At the time of the incident, neither officer had been issued, or were required to wear, bodycams.  See Pl.'s 56(a)2 Stmt. ¶ 48; Defs.' 56(a)1 Stmt. ¶ 48.  East Hartford Police did obtain surveillance video of the incident, though the footage lacks audio.  See, e.g., Defs.' Exhibit K, Video Footage (Doc. No. 159–14).

Officer Clayton Dep. Tr. at 93:17-93:21, 94:23-94:24, 96:16-96:20, 97:3-97:4, 98:14-98:16, 102:21-102:24, 162:1-162:3, 170:16-170:20.  As the plaintiff points out, however, this testimony conflicts with Officer Clayton's contemporaneous report, wherein he notes that he and Officer Beeman "had to place [Mr. Lenetis] on the ground and try to detain/secure him."  Officer Clayton's Case/Incident Report, Pl.'s Ex. 1, at 3 (Doc. No. 166-4).  Officer Beeman's contemporaneous account of the incident also differs from Officer Clayton's deposition narrative, noting that, "[i]n an attempt to control [Mr.] Lenetis, he was escorted to the ground."  Officer Beeman's Case/Incident Report, Pl.'s Ex. 13, at 2 (Doc. No. 166-16).

Once on the ground, the officers placed Mr. Lenetis in handcuffs and secured him.  Pl.'s 56(a)2 Stmt. ¶ 43; Defs.' 56(a)1 Stmt. ¶ 43.  Officer Beeman found the two knives referenced in Ms. Gladstone's 911 call in Mr. Lenetis' back pocket.  See Defs.' Officer Beeman Dep. Tr. at 158:2-158:8.  The parties disagree over whether the officers then gave the knives to Heritage Garden staff or not.  See Pl.'s 56(a)2 Stmt. ¶ 43; Defs.' 56(a)1 Stmt. ¶ 43.  About two minutes after Mr. Lenetis was secured in handcuffs, two officers lifted him off the floor.[6]  See Video Footage, 2nd Floor West W2-1, Pl.'s Ex. 11, at 2:20:24-2:20:29.

At no point throughout the encounter did Mr. Lenetis inform the officers that either his head or his eye were injured.  See See Pl.'s 56(a)2 Stmt. ¶¶ 47, 56; Defs.' 56(a)1 Stmt. ¶¶ 47, 56.  Following the incident, the officers did not complete a use of

---

[6] In defendants' Statement of Material Facts, they cite the transcript of Officer Clayton's deposition to say that, once Mr. Lenetis was secured in handcuffs, he was able to stand up on his own without assistance.  See Defs.' 56(a)1 Stmt. ¶ 51; Defs.' Officer Clayton Dep. Tr. at 111:9-111:15.  This claim, however, is undermined by the footage of the incident, see Video Footage, 2nd Floor West W2-1, Pl.'s Ex. 11, at 2:20:24-2:20:29, thereby creating a material dispute of fact.

force form, though the parties disagree as to whether one was necessary.  See Pl.'s 56(a)2 Stmt. ¶ 59; Defs.' 56(a)1 Stmt. ¶ 59.  The defendants did fill out a Police Emergency Examination Request ("PEER") form, with each officer filling out certain portions of it.  See PEER Form, Pl.'s Ex. 12 (Doc. No. 166-15); Officer Kevin Beeman's October 21, 2021 Deposition Transcript ("Pl.'s Officer Beeman Dep. Tr."), Pl.'s Ex. 7, at 170:12-170:14 (Doc. No. 166-10) ("I didn't remember – some of this is my handwriting, and some of this is Officer Clayton's handwriting); id. at 170:23-171:4 ("Officer Clayton's handwriting is his name, requesting officer, police department, and the case number that's on top.  . . .  [He] must have been talking to somebody and giving me this information.  And I wrote it down for him, because that is my signature at the bottom.").

According to the PEER form, Mr. Lenetis appeared disoriented, disheveled, and uncooperative when he was taken into custody.  PEER Form at 1.  The Officers also described him as combative, rambling, and possessing an inability to focus.  Id.  In addition to recounting the behavior that was the impetus for the 911 call, the form makes clear that Mr. Lenetis was not taking his schizophrenia medication, and that the officers feared alcohol abuse as a medical concern.  Id.  Pursuant to the completed PEER form, Mr. Lenetis was taken to St. Francis Hospital.  See Pl.'s 56(a)2 Stmt. ¶ 58; Defs.' 56(a)1 Stmt. ¶ 58.

    2.    Mr. Lenetis' Transportation to and Treatment at Saint Francis

Mr. Lenetis was transported by Ms. Vest and Mr. Zetterstrom, via ambulance, to Saint Francis.  See Plaintiff's Local Rule 56(a)1 Statement of Facts ("Pl.'s 56(a)1 Stmt.") ¶ 14 (Doc. No. 141-2); Defendants' Local Rule 56(a)2 Statement of Facts ("Defs.' 56(a)2 Stmt.") ¶ 14 (Doc. No. 156-1); Rebecca Vest's January 6, 2022 Deposition Transcript

("Defs.'/Apportionment Pls.' Vest Dep. Tr."), Defs.'/Apportionment Pls.' Ex. M, at 24:6-24:13 (Doc. No. 156-14).  It is not entirely clear, from the available record, what medical assessments were performed by the EMTs on Mr. Lenetis during the ambulance ride.  Mr. Zetterstrom testified that he checked, <u>inter alia</u>, Mr. Lenetis' pupils one time, shortly after he and Ms. Vest arrived at the scene of the incident, <u>see</u> EMT Philip Zetterstrom's January 6, 2022 Deposition Transcript ("Defs.'/Apportionment Pls.' Zetterstrom Dep. Tr."), Defs.'/Apportionment Pls.' Ex. J, at 105:3-105:10 (Doc. No. 156-11), which the Town and officers appear to dispute via their expert reports, <u>see</u> Ludwig Report, Pl.'s Ex. 19, at 6 (Doc. No. 141-22) (asserting that Mr. Zetterstrom did not document that he checked Mr. Lenetis' pupils on his EMT Patient Care Report,[7] and that the "supposition within the EMS profession, as well as the medical profession in general is, if it was not written down, it was not done").  The ambulance carrying Mr. Lenetis arrived at the hospital at about 3:00 pm.  <u>See</u> Pl.'s 56(a)1 Stmt. ¶ 25; Defs.' 56(a)2 Stmt. ¶ 25.

According to Mr. Zetterstrom, upon arrival, he gave the triage team at Saint Francis information on Mr. Lenetis' condition, which was based on (1) information given to him by police at the scene of the incident and (2) his own medical assessment of Mr. Lenetis in the ambulance, including his findings that Mr. Lenetis had "full function of his hands [and] feet", was "speaking without slurred speech", and "presented . . . as a psychiatric patient".  <u>See</u> Philip Zetterstrom's January 6, 2022 Deposition Transcript, Pl.'s Ex. 10, at 28:4-29:16 (Doc. No. 141-13).  Hospital staff then triaged Mr. Lenetis to

---

[7] After a close look through the record, the court could not locate the EMT Patient Care Report referenced in Mr. Ludwig's Report.  It appears that the apportionment plaintiffs did not include the Patient Care Report that Mr. Ludwig cites in their summary judgment materials.

the West Wing of the Hospital.  See Pl.'s 56(a)1 Stmt. ¶ 15; Defs.' 56(a)2 Stmt. ¶ 15;
Medical Records, Pl.'s Ex. 1, at 7 (Doc. No. 141-4).

Approximately one to two hours after Mr. Lenetis was triaged, medical staff
performed a CT head scan on him.  See Medical Records at 4.  Doctors initially
diagnosed Mr. Lenetis with a large subdural hematoma with signs of herniation along
with two or three subdural hemorrhages.  See Medical Records at 7; Dr. Luis Kolb's
March 14, 2022 Deposition Transcript ("Pl.'s Dr. Kolb Dep. Tr."), Pl.'s Ex. 12, at 23:13-
23:14, 61:16-61:21 (Doc. No. 141-15); Dr. Luis Kolb's March 14, 2022 Deposition
Transcript ("Defs.'/Apportionment Pls.' Dr. Kolb Dep. Tr."), Defs.'/Apportionment Pls.'
Ex. F, at 72:17-72:19 (Doc. No. 156-7).  Around 5:00 pm, medical staff attempted to
"contact [a] neurosurgeon for approximately 30 minutes", but they were unsuccessful.
See Discharge Summary, Defs.'/Apportionment Pls.' Ex. L, at 5 (Doc. No. 156-13).  At
about 5:30 pm, medical staff contacted Dr. Luis Kolb ("Dr. Kolb"), a neurosurgeon at
Saint Francis, who "responded immediately".  Id.  Around 6:56 pm, Dr. Kolb performed
emergency neurosurgery on Mr. Lenetis in an attempt to relieve the pressure on his
brain and address his serious brain injuries.  See Defs.'/Apportionment Pls.' Dr. Kolb
Dep. Tr. at 23:15-23:17; Pl.'s 56(a)1 Stmt. ¶¶ 17-18; Defs.' 56(a)2 Stmt. ¶¶ 17-18.
Ultimately, the surgery was unsuccessful, and Mr. Lenetis never regained
consciousness.  Pl.'s 56(a)1 Stmt. ¶ 26; Defs.' 56(a)2 Stmt. ¶ 26.  He passed away on
November 3, 2019.  Pl.'s 56(a)1 Stmt. ¶ 26; Defs.' 56(a)2 Stmt. ¶ 26.

Dr. Frank Evangelista ("Dr. Evangelista"), an associate medical examiner for the
State of Connecticut, performed an autopsy and determined that Mr. Lenetis' death was
a homicide committed by the defendant officers.  Pl.'s 56(a)1 Stmt. ¶¶ 27-28; Defs.'

56(a)2 Stmt. ¶¶ 27-28; Autopsy Report, Pl.'s Ex. 17, at 3 (Doc. No. 166-20).  Based on Dr. Evangelista's review of footage of the incident, hospital records, and the autopsy, he further concluded that the cause of Mr. Lenetis' death was a subdural hematoma due to blunt impact injury of the head, which was sustained when the defendant officers slammed Mr. Lenetis head into the floor.[8]  Pl.'s 56(a)1 Stmt. ¶ 29; Dr. Frank Evangelista's April 28, 2022 Deposition Transcript ("Pl.'s Dr. Evangelista Dep. Tr."), Pl.'s Ex. 17, at 41:11-42:22, 59:19-60:15 (Doc. No. 141-20).

　　　　　3.　　　Training Officers Beeman and Clayton Received

Officer Beeman was hired by the East Hartford Police Department ("EHPD") on July 31, 2017.  See Pl.'s 56(a)2 Stmt. ¶ 66; Defs.' 56(a)1 Stmt. ¶ 66.  For approximately seven months, now-Officer Beeman attended the Hartford Police Academy, where he recalls receiving training with respect to dealing with people with mental health issues.  See Pl.'s 56(a)2 Stmt. ¶¶ 66-67; Defs.' 56(a)1 Stmt. ¶¶ 66-67.  In March 2017, Officer Clayton received training, in the form of a 1.5-hour class, on responding to individuals with mental illness.  See Officer Kwanza Clayton CRT In Service Training Credit Sheet ("Officer Clayton CRT Training"), Defs.' Ex. N (Doc. No. 167-1).

In December 2018, Officers Beeman and Clayton reviewed an EHPD annual refresher training on Responding to Mental Illness, which was designed to review, among other things, the signs and symptoms of various mental health illnesses as well

---

[8] This Statement of Material Fact, the defendants contend, is not supported by admissible evidence because the video surveillance footage is "unreliable", and Dr. Evangelista is "not qualified to perform forensic analysis."  Defs.' 56(a)2 Stmt. ¶ 29.  Not only do the defendants fail to provide any citation to the record to support their objection, but the court is perplexed by the assertion that Dr. Evangelista "is not qualified to perform forensic analysis."  Id.  It is Dr. Evangelista's "job as a medical examiner . . . to determine the cause and manner of death. . . ."  Pl.'s Dr. Evangelista Dep. Tr. at 41:14-15.  For these reasons, this Statement of Material Fact as to the conclusion of Dr. Evangelista's Report is deemed admitted.

as the most current version of EHPD's General Order 185.00 and Connecticut law

pertaining to people in mental health crisis.[9]  Defs.' 56(a)1 Stmt. ¶ 70; Officer Clayton's

Affidavit ("Officer Clayton Aff."), Defs.' Ex. A, at ¶¶ 8-9 (Doc. No. 159-4); Officer

Beeman's Affidavit ("Officer Beeman Aff."), Defs.' Ex. C, at ¶¶ 8-9 (Doc. No. 159-6).

General Order 185.00 is the EHPD's policy for responding to people in crisis and/or

suffering from mental illness.  Defs.' 56(a)1 Stmt. ¶ 70.

It is standard procedure within the EHPD that new or revised General Orders are

disseminated to officers by means of the PowerDMS system.  Pl.'s 56(a)2 Stmt. ¶ 71;

Defs.' 56(a)1 Stmt. ¶ 71.  When officers are assigned to review a new or revised

General Order, they are required to review and electronically sign off on the order

through the PowerDMS system.  Pl.'s 56(a)2 Stmt. ¶ 71; Defs.' 56(a)1 Stmt. ¶ 71.  Both

Officers Beeman and Clayton reviewed and signed off on General Orders when

assigned to do so by their superior officers.  Pl.'s 56(a)2 Stmt. ¶ 72; Defs.' 56(a)1 Stmt.

¶ 72.  Notably, however, Officer Clayton only signed off on General Order 185.00

through PowerDMS once in January 2017, see Deputy Chief Christopher Davis April 4,

2022 Deposition Transcript ("Pl.'s Deputy Chief Davis Dep. Tr."), Pl.'s Ex. 6, at 55:2-

56:2, 57:21-58:15 (Doc. No. 166-9), and Officer Beeman never signed off on General

Order 185.00, see Officer Beeman Aff. ¶ 11.  This means that, before the incident with

Mr. Lenetis, neither officer had reviewed and signed off on the most recent, operative

version of General Order 185.00, which was issued in March 2019.  See Pl.'s Deputy

---

[9] The plaintiff denies this fact, asserting that it directly contradicts the defendant officers' deposition testimony as well as EHPD records.  Pl.'s 56(a)2 Stmt. ¶ 70.  After reviewing the record, the court disagrees.  The defendant officers' Affidavits not only include EHPD records verifying that Officers Beeman and Clayton reviewed the PowerPoint presentation, but they also offer the PowerPoint itself.  See Officer Clayton Aff.; Officer Beeman Aff.  As such, the court deems this material fact admitted.

Chief Davis Dep. Tr. at 58:3-59:15; PowerDMS Signature Reports, Pl.'s Ex. 27 (Doc. No. 166-30).  Still, as of November 1, 2019, Officers Beeman and Clayton were current with all training required to be certified by the Connecticut Police Officers Training Standard Council ("POSTC").  Pl.'s 56(a)2 Stmt. ¶ 69; Defs.' 56(a)1 Stmt. ¶ 69.

B.   Procedural Background

On December 10, 2020, Mr. Wynne filed his Complaint in this action against the Town of East Hartford, Officer Beeman, and Officer Clayton.  See Compl. (Doc. No. 1). The Complaint brings eight Counts under federal and state law.  Counts One and Two allege violations of the ADA and Rehabilitation Act, respectively, by the Town of East Hartford for, inter alia, failing to accommodate Mr. Lenetis' disability and failing to adequately train Officers Beeman and Clayton to provide reasonable accommodations to individuals with mental health disabilities.  Id. at ¶¶ 39-70.  Count Three alleges wrongful death due to negligence under section 52-555 of the Connecticut General Statutes ("section 52-555") against Officers Beeman and Clayton.  Id. at ¶¶ 71-80. Count Four alleges the same against the Town of East Hartford.  Id. at ¶¶ 81-85.  Count Five alleges violation of Article First, Sections 7 and 9 against all three defendants due to Officer Beeman and Clayton's unreasonable seizure of and use of force against Mr. Lenetis.  Id. at ¶¶ 86-89.  Count Six alleges a violation of section 1983 for the Town of East Hartford's custom or practice of, inter alia, failing to train its officers to provide reasonable accommodations to individuals with mental health disabilities.  Id. at ¶¶ 90-97.  Count Seven seeks to hold the Town of East Hartford liable, under section 52-557n of the Connecticut General Statutes ("section 52-557n"), for the damages to Mr. Lenetis that Officers Beeman and Clayton allegedly caused.  Id. at ¶¶ 98-102.  Finally, Count

14

Eight seeks indemnification against the Town of East Hartford under section 7-465 of the Connecticut General Statutes for the damages to Mr. Lenetis allegedly caused by Officers Beeman and Clayton.  Id. at ¶¶ 103-106.

On April 5, 2021, the Town of East Hartford, Officer Beeman, and Officer Clayton filed the Apportionment Complaint seeking to allocate liability to Mr. Zetterstrom, Ms. Vest, the Ambulance Service, and Saint Francis.  See Apportionment Complaint ("Apportionment Compl.") (Doc. No. 25).  Count One alleges that Mr. Zetterstrom and Ms. Vest failed to exercise a reasonable degree of care and skill when transporting Mr. Lenetis to the hospital.  Id. at ¶¶ 1-30.  Count Two seeks to hold the Ambulance Service liable for the alleged negligence of its employees.  Id. at ¶¶ 31-34.  Count Three alleges that Saint Francis failed to exercise a reasonable degree of care and skill when treating Mr. Lenetis.  Id. at ¶¶ 35-46.

On September 28, 2022, Mr. Wynne moved for summary judgment against the Town of East Hartford, Officer Beeman, and Officer Clayton on their apportionment claims.  See Wynne's Mot. for Summ. J.  On October 5, 2022, Saint Francis also moved for summary judgment on the apportionment claims, adopting the arguments in Mr. Wynne's Motion.  See St. Francis' Mot. for Summ. J.  On October 14, 2022, the Ambulance Service, Mr. Zetterstrom, and Ms. Vest moved for summary judgment on the apportionment claims, also adopting the arguments in Mr. Wynne's Motion.[10]  See Ambulance Serv.'s Mot. for. Summ. J.  The Town of East Hartford, Officer Beeman, and Officer Clayton oppose all three Motions.  See Defendants'/Apportionment Plaintiffs'

---

[10] The Ambulance Service, Mr. Zetterstrom, and Ms. Vest also filed a short Memorandum of Law as a supplement to Mr. Wynne's Motion.  See Ambulance Serv.'s Mot. for. Summ. J. at 5.

Memorandum of Law in Support of Objection to Plaintiff's and Apportionment

Defendants' Motions for Summary Judgment ("E. Hartford's Apportionment Opp.") at 1-

2 (Doc. No. 156).

On October 31, 2022, the Town of East Hartford, Officer Beeman, and Officer

Clayton moved to preclude the testimony of two of Mr. Wynne's disclosed experts,

Kathleen Flaherty ("Ms. Flaherty") and Roger Clark ("Mr. Clark").  See E. Hartford's Mot.

to Preclude Experts.  Mr. Wynne opposes the Motion to Preclude.  See Plaintiff's

Opposition to Defendant's Motion to Preclude Expert Testimony (Doc. No. 163).

On November 21, 2022, the Town of East Hartford, Officer Beeman, and Officer

Clayton moved for summary judgment on all eight Counts of Mr. Wynne's Complaint.

See E. Hartford's Mot. for. Summ. J.  Mr. Wynne opposes the Motion for Summary

Judgment.  See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for

Summary Judgment ("Pl.'s Summ. J. Opp.") (Doc. No. 166).

## III.    LEGAL STANDARD

### A.    Motion for Summary Judgment

A motion for summary judgment may be granted only when the moving party can

establish that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64,

71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party

must set forth specific facts demonstrating that there is indeed "a genuine issue for

trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).  Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

    B.    <u>Motion to Preclude</u>

Expert testimony is admissible under Rule 702 of the Federal Rules of Evidence, which provides in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. Rules of Evid. 702.  The district court acts as a gatekeeper, charged with the task of deciding whether the expert's testimony satisfies Rule 702's general requirements. See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 (1993).  The Second Circuit has emphasized that expert testimony should only be excluded if it is "speculative or conjectural", if it is "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith,' or to be in essence an 'apples to oranges comparison.'" Boucher v. U.S. Suzuki Motor Corp., 73 F. 3d 18, 21 (2d Cir. 1996) (quoting Shatkin v. McDonnel Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984)).

In defining the gatekeeping role of the district court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact.  See Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005).

### 1.    Qualifications

Whether the witness is "qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert" is a "threshold matter" that courts consider before analyzing the relevance and reliability of the testimony itself.  Vale v. United States of Am., 673 F. App'x 114, 116 (2d Cir. 2016) (summary opinion) (citing Nimely, 414 F.3d at 396 n.11 (2d Cir. 2005)).  A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). However, the Second Circuit has indicated that an expert's knowledge need not be perfectly tailored to the facts of the case.  See Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81-82 (2d Cir. 1997).  "If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  Tardiff v. City of New York, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018).

### 2.    Reliability

If an expert meets the threshold requirement of qualification, the court must determine whether the expert's testimony itself is reliable. In Daubert, the Supreme Court identified several factors that may be considered in assessing reliability:

(1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation'" and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting Daubert, 509 U.S. at 593–94 (internal quotations and citations omitted)). These factors, however, do not constitute a "definitive checklist or test." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999). Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id.; see also Nicholas v. Bratton, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (stating that "[w]here a proposed expert witness bases his testimony on practical experience rather than scientific analysis, . . . courts recognize that [e]xperts of all kinds tie observations to conclusions through . . . general truths derived from . . . specialized experience" (internal quotation marks and citations omitted)).

In assessing reliability, "[t]he district court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between the testimony of competing expert witnesses." Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc., 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) (citing Travelers Prop. & Cas. Corp. v. Gen. Elec. Co., 150 F. Supp. 2d 360, 362 (D. Conn. 2001)). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

3.      Relevance

In addition to ensuring that expert testimony is reliable, the court must decide

whether the expert's testimony is relevant, i.e., whether it will "help the trier of fact."  In

re Mirena IUD Prod. Liab. Litig., 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016).  Like other

forms of evidence, expert testimony is relevant if it has "any tendency to make the

existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

However, expert testimony that "usurp[s] either the role of the trial judge in

instructing the jury as to the applicable law or the role of the jury in applying that law to

the facts before it", United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991), does

not aid the jury in making a decision.  In re Mirena IUD Prod. Liab. Litig., 169 F. Supp.

3d at 413.  Accordingly, this court permits experts to state opinions, not legal

conclusions.  See Bilzerian, 926 F.2d at 1294 (holding that, while an expert "may opine

on an issue of fact within the jury's province", he "may not give testimony stating

ultimate legal conclusions based on those facts"); see also Snyder v. Wells Fargo Bank,

N.A., 594 F. App'x 710, 714 (2d Cir. 2014) (same).

"Once the thresholds of reliability and relevance are met, the testimony is

admissible.  Thereafter, any purported weakness in an expert's methodology or

conclusion goes to the degree of credibility to be accorded to the evidence, not to the

question of its admissibility."  Royal Ins. Co. of Am., 208 F. Supp. 2d at 426 (citing

Ambrosini v. Labarraque, 101 F.3d 129, 133-35 (D.C. Cir. 1996)).

## IV.    DISCUSSION

### A.    Defendants' Motion for Summary Judgment (Doc. No. 159)

1.    Counts One and Two: Title II of the ADA and the Rehabilitation Act

The defendants[11] argue that Mr. Wynne's ADA and Rehabilitation Act claims against the Town of East Hartford fail as a matter of law.  Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 et seq.  The Rehabilitation Act similarly mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794.[12] Because "Title II's requirements apply with equal force to Rehabilitation Act claims, courts analyze the claims together."  See Andino v. Fischer, 698 F. Supp. 2d 362, 378 (S.D.N.Y. 2010); accord Hargrave v. Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003) (noting that "[ADA] requirements apply with equal force to . . . Rehabilitation Act claims").

To establish a prima facie Title II violation, a plaintiff must show that "1) he is a qualified individual with a disability; 2) [the defendant] is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [the defendant]'s services, programs, or activities or [the defendant] otherwise discriminated against him

---

[11] For convenience, the court will refer to the Town of East Hartford, Officer Beeman, and Officer Clayton as "the defendants" throughout Section IV.A.

[12] The defendants do not contest that the Town of East Hartford is a recipient of federal funding and therefore subject to the Rehabilitation Act.  See Answer to Complaint (Doc. No. 21); E. Hartford's Mot. for Summ. J.

by reason of his disability." <u>Wright</u>, 831 F.3d at 72.  The parties do not dispute that, as a person with schizophrenia, Mr. Lenetis is a qualified individual with a mental health disability.  The defendants argue, however, that the Town of East Hartford is not subject to Title II in the case at bar because the relevant conduct by defendant officers is "not actionable under the ADA".  <u>See</u> Defendants'/Apportionment Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("E. Hartford's Summ. J. Mem.") (Doc. No. 159-1).  The defendants further argue that the Town of East Hartford did not violate the ADA or Rehabilitation Act because (1) the Town did not fail to reasonably accommodate Mr. Lenetis and (2) the Town did not show "deliberate indifference" to the strong likelihood of an ADA violation.  <u>See</u> <u>id.</u> at 10-17.

a)     Applicability of the ADA and Rehabilitation Act

As a threshold matter, the court must determine whether the ADA and Rehabilitation Act apply to the encounter between the defendant officers and Mr. Lenetis.  The statutes apply to "all services, programs, and activities provided or made available by public entities", including state and local governments.  28 C.F.R. § 35.102; <u>accord</u> <u>Am. Council of the Blind of N.Y., Inc. v. City of New York</u>, 495 F. Supp. 3d 211, 230 (S.D.N.Y. 2020) (stating that both the ADA and Rehabilitation Act apply to the "services, programs, or activities" of any state or local government).  The Second Circuit has held that "services, programs, or activities" is a broad, "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context . . . ."  <u>Innovative Health Sys., Inc. v. City of White Plains</u>, 117 F.3d 37, 45 (2d Cir. 1997), <u>superseded on other grounds by</u> <u>Zervos v. Verizon N.Y.</u>, 252 F.3d 163 (2d Cir. 2001).  Moreover, the

22

Second Circuit has emphasized that courts should "avoid . . . hair-splitting arguments" by public entities seeking to evade liability under the statutes.  Id.

The defendants urge this court to hold that Title II does not "appl[y] to an officer's on-the-street response to reported disturbances or other similar incidents prior to the officer's securing the scene and ensuring that there is no threat to human life."  E. Hartford's Summ. J. Mem. at 7.  As both parties note, the Second Circuit has yet to address whether Title II applies to on-the-scene encounters between police officers and individuals with disabilities.  However, most district courts in this Circuit to address the issue have squarely rejected defendants' interpretation and held that police encounters are indeed "services, programs, or activities" within the meaning of Title II.  See Williams v. City of New York, 121 F. Supp. 3d 354, 364-65 (S.D.N.Y. 2015) (finding that Title II applies to "interactions between law enforcement and disabled individuals"); accord Reyes v. Town of Thomaston, No. 3:18-CV-831, 2020 WL 5849529, at *3 n.1, *5 n.5 (D. Conn. Sept. 30, 2020) (noting that police encounters are subject to Title II); Brunette v. City of Burlington, No. 2:15-CV-00061, 2018 WL 4146598, at *32 (D. Vt. Aug. 30, 2018) (finding that Title II applies to law enforcement, including situations where officers wrongly arrest an individual with a disability); Anthony v. City of New York, No. 00-CV-4688, 2001 WL 741743, at *11 (S.D.N.Y. July 2, 2001) (concluding that "police officers' response to the 911 call and seizure of [plaintiff] for psychiatric evaluation are police activities or services and are, thus, covered by the ADA").  Indeed, these courts have emphasized that Title II applies even in situations where exigent circumstances—i.e., safety risks—are present.  See Williams, 121 F. Supp. 3d at 368; accord Reyes, 2020 WL 5849529, at *3 n.1; Brunette, 2018 WL 4146598, at *34.

23

Rather, any "[e]xigent circumstances . . . [should] be considered in determining whether a reasonable accommodation is available."  Brunette, 2018 WL 4146598, at *34.

This court therefore holds, in light of the prevailing case law, that Title II applies to on-the-scene encounters between law enforcement officers and individuals with disabilities.[13]  Officer Beeman and Clayton were required to comply with Title II during their encounter with Mr. Lenetis.

> b)   Violation of the ADA and Rehabilitation Act

>> (1)   Denial of Reasonable Accommodations

Under Title II of the ADA and the Rehabilitation Act, a public entity discriminates against qualified individuals with a disability if it fails to provide them with a "reasonable accommodation" that "permit[s] them to have access to and take a meaningful part in" its services, programs, or activities.  See Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 85 (2d Cir. 2004).  A plaintiff bears the initial burden of demonstrating the "existence of some accommodation that would allow him to meet the essential eligibility requirements of the service, program, or activity at issue."  McElwee v. Cnty. of Orange, 700 F.3d 635, 642 (2d Cir. 2012).  Once the plaintiff has identified a "plausible accommodation, the costs of which, facially, do not clearly exceed its benefits," the defendant bears the burden of showing that "the plaintiff's proposed accommodation is unreasonable."  Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir.1995).

---

[13] The defendants urge this court to follow the Fifth Circuit's holding in Hainze v. Richards, which held that police officers need not "factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves [and others]."  207 F.3d 795, 801 (5th Cir. 2000).  However, most courts in this Circuit have not followed the Fifth Circuit's approach, and some have explicitly rejected it.  See, e.g., Reyes, 2020 WL 5849529, at *3 n.1 (declining to follow Hainze and describing it as an "outlier").  Given its obligation to broadly construe Title II—as required by the Second Circuit—this court similarly declines to adopt the reasoning in Hainze.

The Second Circuit has emphasized that the reasonableness of a potential accommodation is a fact-specific inquiry that "often must be resolved by a factfinder." See Noll v. Int'l Bus. Machs. Corp., 787 F.3d 89, 94 (2d Cir. 2015).

Here, Mr. Wynne contends that there were multiple reasonable accommodations that the officers could have utilized in their encounter with Mr. Lenetis, including various de-escalation techniques—such as speaking and moving slowly and repeating commands—as well as waiting for a CIT-trained officer.[14] See Pl.'s Summ. J. Opp. at 13; accord Felix, 344 F. Supp. 3d at 665-66 (noting that cities are "obligated to accommodate individuals with disabilities in the operation of its police department, including delaying, where safety concerns permit, approaching individuals in the middle of mental health crises"). The defendants counter that "neither of them had the time nor the opportunity to independently assess [Mr. Lenetis'] mental health issues and, thus, to determine what accommodations may be helpful." See E. Hartford's Summ. J. Mem. at 14. Mr. Wynne, however, has proffered evidence that challenges the defendants' assertion. A CIT-trained officer, Officer Hawley, arrived on the scene only two minutes after Officers Beeman and Clayton. Pl.'s Officer Clayton Dep. Tr. at 33:2-33:11. Despite the availability of Officer Hawley—who, as a CIT officer, was well trained in handling the needs of mentally disabled individuals, see Pl.'s Deputy Chief Davis Dep. Tr. at 79:2-79:7—Officers Beeman and Clayton did not utilize him as a resource, see Pl.'s Officer Clayton Dep. Tr. at 152:1-152:8. In addition, although the defendants have testified that they do not recall learning that Mr. Lenetis was disabled until after their

---

[14] Each of the potential accommodations cited by Mr. Wynne are listed in the EHPD's General Order 185.00. See East Hartford Police Department General Order 185.00.00 ("General Order 185.00"), Pl.'s Ex. 15, at 3-7 (Doc. No. 166-18).

encounter with him in the hallway, Ms. Gladstone has testified that she believes she informed the officers that Mr. Lenetis had schizophrenia while she was walking them to Mr. Lenetis' room.  See Pl.'s Gladstone Dep. Tr. at 71:13-71:15.  Officer Clayton has also testified that he assumed that Mr. Lenetis lived at Heritage Garden as a result of a mental health disability. Defs.' Officer Clayton Dep. Tr. at 79:6-79:21.  Construing the evidence in a light most favorable to the plaintiff, a reasonable juror could conclude that the officers should have, inter alia, waited for the CIT-trained officer before engaging with Mr. Lenetis.

The defendants contend that, because "Mr. Lenetis was reported to be armed with knives", thereby posing "a safety issue to [himself] and others", an "immediate police response" was required.  See Defs.' LR 56a(1) Stmt. ¶¶ 30, 32. However, the court cannot conclude, from the available record, that the exigent circumstances at hand clearly prevented the officers from providing Mr. Lenetis with a reasonable accommodation.  When the defendant officers first approached and encountered Mr. Lenetis, he was in his room.  See, e.g., Pl.'s Officer Clayton Dep. Tr. at 89:6-89:11.  The officers have testified that, when Mr. Lenetis stepped out of his room after they knocked on his door, he did not have any visible weapons in his hand.  See id. at 91:13-91:15; Pl.'s Officer Beeman Dep. Tr. at 118:2-118:4.  Nevertheless, the defendant officers grabbed Mr. Lenetis within seconds of him exiting his room.  See Video Footage, 2nd Floor West W2-1, at 2:16:04–2:16:08.[15]

---

[15] The defendants argue that the surveillance footage should not be considered because it "lacks authentication, is misleading, and is irrelevant", and "fails to meet[ ] the standard set forth" in Scott v. Harris, 550 U.S. 372 (2007).  See Defendants' Reply to Plaintiff's Opposition Memorandum ("E. Hartford's Reply"), at 4-5 (Doc. No. 167).  However, the defendants have not offered any "specific reason to doubt [the footage's] authenticity." Hallet v. Stuart Dean Co., 517 F. Supp. 3d 260, 268 (S.D.N.Y. 2021). Because the footage appears to be authentic, and because district courts have broad discretion to

Given this evidence, a reasonable juror could conclude that Officers Beeman and Clayton could have used de-escalation techniques—pursuant to General Order 185.00—to ensure that Mr. Lenetis was safely taken into custody for mental health treatment, instead of immediately resorting to physical force.  The evidence is sufficient to raise a material dispute of fact as to whether the defendant officers violated Title II by failing to accommodate Mr. Lenetis' schizophrenia.

(2)     Deliberate Indifference

The defendants further argue that, even if the officers failed to reasonably accommodate Mr. Lenetis' disability, Mr. Wynne cannot demonstrate that the Town of East Hartford engaged in "intentional discrimination[,] as required for damages under the ADA and Rehabilitation Act."  See E. Hartford's Summ. J. Mem. at 14-17.  A municipality may be liable for intentional discrimination if it is "deliberate[ly] indifferen[t]" to the strong likelihood of a violation of the ADA and Rehabilitation Act.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275 (2d Cir. 2009).

Mr. Wynne contends that the Town of East Hartford showed deliberate indifference because it failed to train its officers to provide reasonable accommodations

---

determine whether an item of evidence is properly authenticated, the court will overrule the defendants' objection as to authenticity for purposes of summary judgment.  See PharmacyChecker.com v. Nat'l Assoc. of Bds. of Pharm., No. 19-CV-7577, 2023 WL 2973038, at *4 (S.D.N.Y. Mar. 28, 2023).

The court also declines to exclude the footage on the basis that it is "irrelevant" or "misleading".  Footage of the incident between Mr. Lenetis and the officers is plainly relevant evidence.  Whether the footage is misleading or reliable generally goes to the weight of the evidence, rather than admissibility.  See Cabrera v. New York, No. 16-CV-7938, 2018 WL 5276425, at *14 (S.D.N.Y. Oct. 23, 2018).  Finally, the court also notes that Scott v. Harris is irrelevant to the issue of whether the surveillance footage is admissible.  In Scott, the Supreme Court assessed whether the contents of surveillance footage "so utterly discredited" the respondent's testimony that no rational trier of fact could have found in favor of the respondent.  550 U.S. at 380-381.  Here, the court is merely considering the surveillance footage along with multiple other pieces of evidence, including the defendant officers' testimony, to determine if there is a material dispute of fact.  As such, Scott v. Harris does not bar this court from reviewing and considering the surveillance footage.

27

to individuals with disabilities, despite knowing that its officers are likely to frequently interact with people with disabilities.  Pl.'s Summ. J. Opp. at 16-19.  The Second Circuit has yet to clearly define the deliberate indifference standard in the context of failure-to-train claims under the ADA and Rehabilitation Act.  However, it has emphasized that deliberate indifference must be a "deliberate choice", rather than bureaucratic inaction or negligence.  See Loeffler, 582 F.3d at 275.  Nonetheless, "courts in this circuit have found that plaintiffs provided sufficient evidence of deliberate indifference when they could point to training deficiencies of which municipal entities were aware and which existed with respect to populations police would necessarily encounter as they did their duties."  Felix v. City of New York, 344 F. Supp. 3d 644, 666 (S.D.N.Y. 2018).

Here, Mr. Wynne has proffered evidence sufficient to raise a dispute of material fact as to whether the Town of East Hartford's training was deficient.  At the time of the incident, neither Officer Beeman nor Officer Clayton had reviewed and signed off on the operative version of General Order 185.00, which was issued in March 2019, see Pl.'s Deputy Chief Davis Dep. Tr. at 58:3-59:15; PowerDMS Signature Reports.  In addition, as Mr. Wynne notes, it does not appear, from the existing record, that the officers had received instruction on how to comply with the substantive guidelines of General Order 185.00—including the use of CIT-trained officers—aside from a general requirement to review and sign off on the Order and a PowerPoint refresher in December 2018.[16]  See Officer Beeman Aff. ¶ 11; Responding to Mental Illness 2018, Ex. 3 to Officer Beeman

---

[16] As noted above, Officer Clayton received training on handling individuals with mental illness in March 2017.  See Officer Clayton CRT Training.  However, it is unclear, from the materials provided to the court, whether this training addressed the substantive guidelines of General Order 185.00, as in effect in 2017, including the utilization of a CIT-trained officer.

Aff.; Officer Clayton Aff. ¶¶ 8-9; Responding to Mental Illness 2018, Ex. 3 to Officer

Clayton Aff.  The court cannot locate, in the available record, any evidence of hands-on

training or instruction as to what General Order 185.00 identifies as good practice or

how police officers should apply these practices to their encounters with individuals with

mental health disabilities.

      Construed in a light most favorable to the plaintiff, Mr. Wynne has provided

evidence of specific training deficiencies that relate directly to individuals with mental

health disabilities—a "population[ ] that [EHPD officers] would necessarily encounter as

they did their duties."   Felix, 344 F. Supp. 3d at 666; accord Butchino v. City of

Plattsburg, No. 8:20-CV-796, 2022 WL 137721, at *12 (N.D.N.Y. Jan. 14, 2022).

Indeed, evidence in the record confirms that EHPD officers frequently encounter

individuals with mental health disabilities when exercising their job duties.  See, e.g.,

Pl.'s Deputy Chief Davis Dep. Tr. at 168:19-168:25 (agreeing that it is "entirely likely"

that "officers . . . in East Hartford are going to encounter emotionally disturbed persons

on a frequent basis as part of their duties"); 2019 EHPD Use of Force Analysis, Pl.'s Ex.

27, at 16 (Doc. No. 166-30) (finding that, of the identified subjects against whom force

was utilized, and where the subjects were identified as either "emotionally disturbed" or

"not emotionally disturbed", 58.6% were "emotionally disturbed").  Finally, Mr. Wynne

has also provided an analysis of forty-eight "use of force" reports documenting

encounters with individuals with mental health disabilities, filed by EHPD officers from

January 1, 2016 to November 1, 2019, which shows that East Hartford police officers

used a CIT-trained officer only five times—i.e., 10% of the time—and used de-

escalation techniques only twenty-one times—i.e., 44% of the time.  See Plaintiff's

Analysis of EHPD Use of Force Reports ("Pl's Use of Force Analysis"), Pl.'s Ex. 32

(Doc. No. 166-35).[17]   The reports and analysis, construed in a light most favorable to

the plaintiff, constitute evidence that the failure of EHPD officers to accommodate

individuals with disabilities was a reoccurring problem—a problem evident from the

Town of East Hartford's own documents, of which it should have been aware.   As the

Second Circuit has held, evidence of potential knowledge of a violation, and a failure to

"respond adequately", are sufficient to create a triable issue of fact as to deliberate

indifference under the ADA and Rehabilitation Act.   See Loeffler, 582 F.3d at 276;

accord Felix v. City of New York, No. 16-CV-5845, 2020 WL 6048153, at *2 (S.D.N.Y.

Oct. 13, 2020) (denying summary judgment, for a Monell claim, where the record

contained evidence "from which a reasonable juror could find that the City knew that [its]

officers regularly encountered emotionally disturbed persons; that officers frequently

_____

[17] The defendants contend that this "exhibit lacks foundation and authentication and consists of hearsay."  See E. Hartford's Reply at 5.  Mr. Wynne argues that the exhibit is admissible under Rule 1006 of the Federal Rules of Evidence, see Plaintiff's Statement of Additional Material Facts ("Pl.'s AMF") ¶ 96 n.3 (Doc. No. 166-1), which provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court", see Fed. R. Evid. 1006.

Here, the plaintiff asserts that the data displayed in the exhibit was collected from police reports, which the plaintiff obtained via Freedom of Information ("FOI") requests to the Town of East Hartford.  See Pl.'s AMF ¶ 96 n.3.  Plaintiff's counsel states that it "produced the[ ] [reports] to Defendants immediately prior to the commencement of this action", see id. ¶ 96 n.3, and it has provided the court with copies of its correspondence with the Town of East Hartford regarding the FOI request, see Pl's Use of Force Analysis.  The defendants have not given the court any specific reason as to why the Exhibit may be inaccurate or unreliable.  See Hallet, 517 F. Supp. 3d at 268.

Moreover, because the underlying police reports appear to have been prepared by officers with personal knowledge of the events detailed in the report, see Pl's Use of Force Analysis at 6 (requesting "all Use of Force reports filed by East Hartford police officers following encounters with individuals known to have [mental health disabilities]"), the court will not exclude the reports as hearsay, see D.R. v. Rodriguez v. Santos Bakery, Inc., No. 20-CV-3628, 2023 WL 3736441, at *3 (S.D.N.Y. May 31, 2023) (noting that "a police report is [generally] admissible as an exception to the hearsay rule as either a business record . . . or as a public record", provided that the report is "based on the officer's personal knowledge").  Thus, for purposes of summary judgment, the court declines to exclude this Exhibit.

mishandled these encounters; and that doing so often resulted in preventable uses of lethal force").

In sum, the court finds that there are material disputes of fact as to whether the Town of East Hartford showed deliberate indifference to its officers' training on accommodating individuals with disabilities. There is, in the record, sufficient evidence upon which a reasonable jury could find deliberate indifference under the ADA and Rehabilitation Act. The court therefore denies the defendants' Motion for Summary Judgment as to Counts One and Two.

> 2.   Count Six: Monell Liability Under Section 1983

To "prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy [or custom] of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)). Here, the defendants argue that plaintiff's Monell claim against the Town of East Hartford fails as a matter of law because (1) "the defendants did not violate [Mr. Lenetis'] Fourth and/or Fourteenth Amendment rights" and (2) even if a constitutional violation occurred, "the record evidence does not support that it was due to an official policy or custom of the Town." E. Hartford's Summ. J. Mem. at 17.

> a)   Violation of Constitutional Rights

Mr. Wynne contends that Officers Beeman and Clayton used excessive force against Mr. Lenetis, in violation of his Fourth Amendment rights. Pl.'s Summ. J. Mem. at 20. Courts analyze excessive force claims under the "objective reasonableness"

standard, which requires courts to assess "whether the officers' actions [we]re

'objectively reasonable' in light of the facts and circumstances confronting them, without

regard to their underlying intent or motivation."  Graham v. Connor, 490 U.S. 386, 397

(1989).  In doing so, courts consider various factors, including (1) "the severity of the

crime at issue", (2) "whether the suspect pose[d] an immediate threat to the safety of

the officers or others", and (3) "whether [the suspect] is actively resisting arrest or

attempting to evade arrest by flight."  Id. at 396.  The Second Circuit has cautioned that,

"[g]iven the fact-specific nature of the inquiry, granting summary judgment against a

plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder

could conclude that the officers' conduct was objectively unreasonable."  See Amnesty

Am. v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004).

 Here, there are material disputes of fact as to whether the officers' conduct was

reasonable, given the circumstances confronting them.  First, there is a clear dispute of

material fact as to whether Mr. Lenetis posed an immediate threat to the officers and

others.  As the defendants note, the officers were originally called to the scene because

Mr. Lenetis was stabbing pumpkins with a knife and throwing chairs.  See Defs.'

Gladstone Dep. Tr. at 56:7-56:56:11.  Indeed, Ms. Gladstone has testified that, when

she called the police, she believed she and other residents faced an imminent threat of

harm.  See id. at 92:5-92:8.  However, at the time of the officers' arrival, Mr. Lenetis had

retreated to his room and was no longer stabbing pumpkins, throwing chairs, or

otherwise engaging in any visibly dangerous behavior.  See, e.g., Pl.'s Officer Clayton

Dep. Tr. at 89:6-89:11; Video Footage, 2nd Floor West W2-1, at 2:16:00-2:16:10.

The defendants nonetheless contend that "some degree of force was necessary" to secure Mr. Lenetis because, at the time of the encounter, the officers believed Mr. Lenetis may have still been armed, which was particularly concerning given the "close proximity" between them.  See E. Hartford's Summ. J. Mem. at 21-22.  However, as discussed above, both Officers Beeman and Clayton have testified that, when they encountered Mr. Lenetis, they observed that both of his hands appeared to be empty, with no visible weapons.  Pl.'s Officer Clayton Dep. Tr. at 91:13-91:15; Pl.'s Officer Beeman Dep. Tr. at 118:2-118:4.  It does not appear—from the available video footage and the defendant officers' testimony—that Mr. Lenetis made any sudden movements or any other gestures that could reasonably be interpreted as threatening.  The defendants merely note that he exited the room quickly in response to them knocking, which "startled" them.  See Pl.'s Officer Clayton Dep. Tr. at 89:6-89:11.  Second, there is a clear dispute of material fact as to whether Mr. Lenetis initially resisted the officers' efforts to take him into custody.  As Mr. Wynne notes, the defendant officers have testified that Mr. Lenetis was initially cooperative when he exited his room.  Pl.'s Officer Clayton Dep. Tr. at 89:12-89:15; Pl.'s Officer Beeman Dep. Tr. at 131:14-132:14. Although the defendants assert that Mr. Lenetis attempted to walk away from the officers, Mr. Wynne cites the video surveillance as evidence that, contrary to defendants' testimony, Mr. Lenetis made no attempt to move away from the officers before they initiated physical contact and grabbed him.  See Video Footage, 2nd Floor West W2-1, at 2:16:04-2:16:10.  These disputed, material facts foreclose summary judgment.

The court also notes that, even if some degree of force may have been necessary, there is a material dispute of fact as to whether the force used on Mr. Lenetis was excessive.  Mr. Lenetis died after his encounter with the officers, and the autopsy report concluded that he died from a "subdural hematoma due to blunt impact injury of [his] head" which occurred when his "head" was "struck . . . on [the] floor during [a] takedown by police".  See Autopsy Report.  Indeed, both Officer Clayton and Officer Beeman acknowledge that Mr. Lenetis' head might have hit the floor during their takedown.  See, e.g., Pl.'s Officer Clayton Dep. Tr. at 102:5-102:13; Pl.'s Officer Beeman Dep. Tr. at 149:3-149:7.  Given these facts, the court cannot conclude that "no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable."  Amnesty, 361 F.3d at 123.  Rather, the court finds a reasonable juror could conclude, based on the available evidence, that the defendants used excessive force against Mr. Lenetis, in violation of his Fourth Amendment rights.

> b)   Official Policy or Custom: Failure to Train

Having found that a reasonable juror could conclude that defendants violated Mr. Lenetis' constitutional rights, the court must now assess whether the constitutional violation was caused by an official policy or custom of the Town of the East Hartford.  A municipality may be held liable under section 1983 for failing to train its police officers.  This failure must "amount[ ] to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  In the section 1983 context, the "deliberate indifference" standard is well-defined and "stringent", "requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520

34

U.S. 397, 410 (1997).  To establish deliberate indifference under section 1983, a plaintiff must show that (1) a policymaker knows to a "moral certainty" that its "employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights".  See Walker v. City of New York, 974 F.2d 293, 298-99 (2d Cir. 1992).  In addition, a plaintiff must "identify a specific deficiency in the city's training program" and, in turn, establish that said deficiency is closely related to the plaintiff's injury.  Amnesty, 361 F.3d at 129.

As a threshold matter—and, as discussed above—Mr. Wynne has proffered evidence that the Town of East Hartford failed to ensure that Officers Beeman and Clayton had reviewed and signed off on the operative version of General Order 185.00.  He has also provided evidence that the EHPD's training is deficient in other respects— namely, that the Department's process for training its officers on the substantive guidelines of General Order 185.00 consists of only a general requirement that its officers review and sign off on the Order and review occasional PowerPoint refreshers, see Officer Beeman Aff.; Officer Clayton Aff., instead of more comprehensive and in-depth training programs designed to ensure that its officers are understanding and internalizing the Order's substantive guidelines.[18]

Construing the evidence in a light most favorable to the plaintiff, as it must, the court finds that Mr. Wynne has identified a "specific deficiency"—i.e., the Department's

---

[18] Indeed, Officer Beeman has testified that he "was not assigned or required to formally review and sign off on General Order 185.00.00 prior to the incident other than as part of the PowerPoint refresher training in December of 2018."  Officer Beeman Aff. ¶ 9.

failure to ensure that its officers are sufficiently trained on the guidelines of General Order 185.00, including the use of CIT-trained officers—sufficient to survive summary judgment.  Moreover, the plaintiff has provided evidence that the deficiency is "closely related to [Mr. Lenetis'] injury".  <u>Amnesty</u>, 361 F.3d at 129.  Officers Beeman and Clayton did not utilize the services of a CIT-trained officer, even though one was present within minutes of their arrival, <u>see</u> Pl.'s Officer Clayton Dep. Tr. at 33:2-33:11, and they failed to use de-escalation techniques when taking Mr. Lenetis into custody, as instructed by General Order 185.00.  As such, the court finds that there is sufficient evidence to create a question of fact as to whether Mr. Lenetis' injury was caused, in part, by deficiencies in the EHPD's training.

In turn, the court finds that there is sufficient evidence to raise a triable issue of fact as to each element of the "deliberate indifference" standard.  First, the plaintiff has provided use of force reports from the EHPD documenting frequent encounters between officers and "emotionally disturbed" individuals, <u>see, e.g.</u>, 2019 EHPD Use of Force Analysis, as well as testimony from Deputy Chief Davis that EHPD officers are likely to encounter "emotionally disturbed" individuals on a frequent basis, <u>see</u> Pl.'s Deputy Chief Davis Dep. Tr. at 168:19-168:25.  These reports and testimony constitute evidence that the Town of East Hartford knew to a "moral certainty" that its officers would encounter individuals with mental health disabilities, and that "some of those people would need accommodation in order to interact with the police".  <u>See</u> <u>Williams</u>, 121 F. Supp. 3d at 375.  Second, Mr. Wynne has proffered evidence of repeated instances in which EHPD officers used force against individuals with mental health disabilities without utilizing reasonable accommodations.  <u>See</u> Pl.'s Use of Force Analysis.  Moreover, the EHPD's

own General Order 185.00 appears to recognize that adequate training would make it "less difficult" for officers to engage with individuals with mental health disabilities.  See General Order 185.00 at 7 (requiring "entry level training regarding persons in crisis and/or those suffering from mental illness" as well as "refresher training on an annual basis").  Thus, Mr. Wynne has offered evidence sufficient to raise a material dispute of fact as to whether EHPD officers frequently mishandle encounters with individuals with mental health disabilities, and whether the Town knew that adequate training would make these encounters "less difficult".  See Felix, 2020 WL 6048153, at *3 (noting that a plaintiff can "satisfy the second prong of the deliberate indifference standard" by either showing that there is a history of employees mishandling a given situation or that the situation presents the employee with a difficult choice that training would make less difficult (emphasis added)).  Finally, as other courts in this Circuit have affirmed, the "wrong choice" by employees—i.e., failing to accommodate individuals with mental health disabilities—is likely to frequently cause violations of disabled citizen's constitutional rights, including the "preventable use[ ] of lethal force."  Id. at *2.

In sum, there are genuine questions of material fact as to whether the Town of East Hartford failed to adequately train its officers and, in doing so, showed deliberate indifference to the rights of individuals with mental health disabilities.  The defendants' Motion for Summary Judgment as to Count Six is thus denied.

3.      Counts Three, Four, and Seven: Wrongful Death (Negligence)[19]

a)      Negligence

The defendants move for summary judgment as to Counts Three, Four, and Seven—which allege liability for wrongful death due to negligence under section 52-555 and section 52-557n of the Connecticut General Statutes against all three defendants— on the basis that the claims fail as a matter of law.  See E. Hartford's Summ. J. Mem. at 29-36.  Section 52-555 provides that the "executor or administrator [of a decedent's estate] may recover" damages from "the party legally at fault" for "injuries resulting in [the decedent's] death".  Conn. Gen. Stat. § 52-555.  Under section 52-557n, a political subdivision may be held liable for "negligent acts or omissions" by its employees.  Id. § 52-557.

The "essential elements of a cause of action in negligence [under Connecticut state law] are well established: duty; breach of that duty; causation; and actual injury." RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 384 (1994).  The defendants do not contest that they owed Mr. Lenetis a duty of care when taking him into custody for mental health treatment.  Indeed, the Connecticut Supreme Court has found that officers owe a duty of care to individuals in their custody, and that this duty extends to, inter alia, "sheriffs, jailers, [and] officials charged with the care of mentally impaired individuals".  Murdock v. Croughwell, 268 Conn. 559, 570-71 (2004); accord Thomes v. Tuyen Duong, No. CV055001223S, 2008 WL 901442, at *8 (2008) (citing Murdock for

_____

[19] In their Motion for Summary Judgment, the defendants analyze all three Counts together.  See E. Hartford's Summ. J. Mem. at 29-36.  The plaintiff also analyzes the three Counts together in his Opposition.  See Pl.'s Summ. J. Opp. at 39-35.  Because both parties analyze the claims together, and because all three Counts turn on the same set of disputed facts, the court will follow the parties' lead and analyze Counts Three, Four, and Seven together.

the proposition that, "[w]hen a person is taken into custody by the police, that person is owed a duty of care").

The defendants, however, assert that Mr. Wynne has failed to establish breach and causation.  Generally, once a court has found that a duty of care existed, it is the "trier of fact" who must "determine whether the defendant violated that duty in the particular situation at hand."  Shore v. Town of Stonington, 187 Conn. 147, 151-52 (1982).

Here, there are clear disputes of material fact that must be resolved by a trier of fact.  The defendants contend that Officers Beeman and Clayton "used the minimal amount of force necessary to safely" detain Mr. Lenetis, and they cite the Report of the State's Attorney, which found the same in its assessment as to whether the officers were criminally liable.  See Report of the State's Attorney Concerning the Death of Andrew Lenetis, Defs.' Ex. M, at 9 (Doc. No. 159-16).[20]  The plaintiff, however, has provided evidence that the officers (1) failed to provide reasonable accommodations to Mr. Lenetis, despite having the opportunity do so, see Section IV.A.1.b.1, supra; and (2) pushed Mr. Lenetis' head directly against the ground during their encounter, see, e.g., Pl.'s Officer Clayton Dep. Tr. at 102:5-102:13 (stating that Mr. Lenetis' head "could have" hit the floor); id. at 163:3-163:7 (acknowledging that, during the encounter with Mr. Lenetis, he did not attempt to protect Mr. Lenetis' head from injury); Pl.'s Officer Beeman Dep. Tr. at 180:3-180:5 (acknowledging, based on a slowed down version of

---

[20] The plaintiff argues that the opinions and conclusions in the State's Attorney's Report are inadmissible because they are irrelevant and unfairly prejudicial, and not based on personal knowledge. See Pl.'s 56(a)2 Stmt. ¶ 73.  Because genuine issues of material fact foreclose summary judgment regardless of whether the Report is considered, meaning that the Report has no impact on the outcome of the pending Motion, the court declines—at this summary judgment stage—to exclude the Report.  Its admissibility remains an issue for trial.

the hallway surveillance footage, that Mr. Lenetis' head ended up "on the floor" during

the encounter); Video Footage, 2nd Floor West W2-11, Pl.'s Ex. 11, at 2:16:25–2:16:40

(showing the officers bring Mr. Lenetis to the ground); Video Footage, 2nd Floor West

W2-1, at 2:16:25-2:16:40 (same).  And, as discussed above, there are material disputes

of fact as to whether the defendant officers violated their duty of care, in part, because

of inadequate training by the Town of East Hartford.  See Sections IV.A.1.b.2, IV.A.2.b,

supra.  These disputed facts are sufficient to create a triable issue on the element of

breach.

      The plaintiff must also "prove not only a violation of a standard of care as a

wrongful act, but also a causal relationship between the injury and the resulting death."

Grody v. Tulin, 170 Conn. 443, 448 (1976).  To establish causation, a plaintiff must

show (1) causation in fact, i.e., that the injury "would not have occurred but for the

actor's conduct"; and (2) proximate cause, i.e., that the conduct was a substantial factor

behind plaintiff's injuries and that there was an unbroken sequence of events

connecting the two.  Rawls v. Progressive N. Ins. Co., 310 Conn. 768, 776-77 (2014).

      The Connecticut Supreme Court has emphasized that causation is usually "a

factual issue" that "belongs to the trier of fact".  Stewart v. Federated Dep't Stores, Inc.,

234 Conn. 597, 611 (1995).  This is such a case.  Mr. Lenetis' autopsy report concludes

that his death was due to "subdural hematoma due to blunt impact injury of [his] head",

which occurred when his head was "struck . . . on [the] floor during [a] takedown by

police".  Autopsy Report at 3; Pl.'s Dr. Evangelista Dep. Tr. at 41:11-42:22, 59:19-60:15.

The defendants themselves appear to implicitly acknowledge that there is a dispute of

material fact as to causation, because they note that "[m]edical experts in the case

disagree concerning whether the decedent's subdural hematoma was chronic (old) or acute (new)."  E. Hartford's Summ. J. Mem. at 32.

Thus, taking the record as a whole, and drawing all inferences in the plaintiff's favor, the court finds that Mr. Wynne has adduced enough evidence such that a reasonable jury could find that causation has been established, foreclosing summary judgment.

b)    Governmental Immunity

The defendants argue that, even if the officers were negligent, they are nonetheless entitled to governmental immunity.  Generally, governmental immunity applies whenever an officer is performing "discretionary acts".  See Belanger v. City of Hartford, 578 F. Supp. 2d 360, 366-67 (D. Conn. 2008); Mulligan v. Rioux, 229 Conn. 716, 727 (1994).  The plaintiff does not contest that Officers Beeman and Clayton were performing "discretionary" acts during their encounter with Mr. Lenetis.  However, "[t]here are three exceptions to the governmental immunity for discretionary acts conferred by section 52–557n . . . "  Belanger, 578 F. Supp. at 366-67.  The first exception—and the one relevant to the case at bar—is the "identifiable person-imminent harm exception".  Id.  Under this exception, a defendant who would otherwise be entitled to governmental immunity may be held liable if "the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . ."  Evon v. Andrews, 211 Conn. 501, 505 (1989).  The Connecticut Supreme Court has established a three-part test for meeting the requirements of the exception—there must be: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct

is likely to subject that victim to that harm."  Doe v. Petersen, 279 Conn. 607, 616 (2006).

Here, Mr. Wynne has proffered evidence that raises a material issue of fact as to each element of the test.  First, he has provided evidence that, during the encounter between Mr. Lenetis and Officers Beeman and Clayton, the officers caused Mr. Lenetis' head to hit the floor—after physically grabbing him without any verbal warning—which in turn caused him to suffer a fatal subdural hematoma.  See, e.g., Pl.'s Officer Clayton Dep. Tr. at 102:5-102:13; Pl.'s Officer Beeman Dep. Tr. at 180:3-180:5; Video Footage, 2nd Floor West W2-11, at 2:16:25–2:16:40; Autopsy Report.  Such evidence sufficiently raises an issue of fact as to whether Mr. Lenetis was subject to an "imminent harm".  See Belanger, 578 F. Supp. at 367 (finding that a plaintiff was "subject to imminent harm" from a baton blow to the face without warning).

Second, there is evidence that Mr. Lenetis was an "identifiable victim": the officers were looking specifically for Mr. Lenetis when they walked up to his room, see, e.g., Pl.'s Officer Clayton Dep. Tr. at 80:18-80:21 (noting that Ms. Gladstone led him and Officer Beeman to Mr. Lenetis' room), and it is undisputed that Mr. Lenetis was the sole individual on whom Officers Beeman and Clayton used force, see generally id.; Pl.'s Officer Beeman Dep. Tr.

Finally, there is some evidence that it was "apparent" to the officers that their conduct was likely to cause Mr. Lenetis harm.  Officer Beeman acknowledged in his deposition that, "[i]f an individual in the control of police is brought to the ground head first and [does not] have the ability to shield himself from the fall", it is "likely that [he is] going to get an injury".  Pl.'s Officer Beeman Dep. Tr. at 156:25-157:5.  Moreover, there

is evidence that the officers were made aware, before the encounter, that Mr. Lenetis was schizophrenic and off his medications at the time, see, e.g., Pl.'s Gladstone Dep. Tr. at 71:13-71:15, making it more likely that Mr. Lenetis would react negatively to sudden movements or physical contact by the officers, thereby increasing his risk of harm.  This evidence, construed in a light most favorable to the plaintiff, is sufficient to raise a triable issue of fact as to whether it was apparent to defendants that their conduct would likely harm Mr. Lenetis.  See Cooper v. City of Hartford, No. 3:07-CV-823, 2009 WL 2163127, at *26 (D. Conn. July 21, 2009) (denying summary judgment in part because it was "apparent that forcibly removing . . . a severely injured man . . . from [a] vehicle could subject him to imminent harm"); see also Quezada v. City of Waterbury,  No. 3:22-CV-77, 2023 WL 5096144, at *2, 7 (D. Conn. Aug. 9, 2023) (finding that plaintiff alleging that officer physically assaulted him while he was handcuffed to a hospital bed "alleged facts which show that he was an identifiable victim at risk of imminent harm and that it was apparent to [the defendant] that his conduct would harm the plaintiff").

Because there are material disputes of fact as to whether the "identifiable person-imminent harm exception" applies, the court cannot conclude, at this juncture, that the defendants are entitled to governmental immunity.  The Motion for Summary Judgment as to Counts Three, Four, and Seven is therefore denied.

### 4.    Count Five: Connecticut Constitution

The defendants also move for summary judgment on Mr. Wynne's "claim for excessive force brought pursuant to Article First, §§ 7 and 9 of the Connecticut constitution".  E. Hartford's Summ. J. Mem. at 36.  Article First, Section 7 provides that

43

"[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures."  Conn. Const. art. 1 § 7.  Article First, Section Nine provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law."  Id. § 9.  The Connecticut Supreme Court has recognized a private right of action for money damages stemming from violations of sections 7 and 9.  See Binette v. Sabo, 244 Conn. 23, 49-50 (1998).

The defendants contend that they cannot be held liable under the Connecticut Constitution because their conduct was not "egregious" enough to establish a state constitutional violation.  As defendants note, some Connecticut courts and courts in this District have held that a defendant can only be held liable for misconduct that is "egregious."  See Martin v. Brady, 64 Conn. App. 433, 440-41 (2001); Bauer v. City of Hartford, No. 3:07-CV-1375, 2010 WL 4429697, at *12 (D. Conn. Oct. 29, 2010).  However, other courts—including this court—have rejected the "egregious" violation standard as a misreading of Binette.  See Gilbert v. Newton, No. 3:13-CV-1715, 2015 WL 3755955, at *3-4 (D. Conn. June 15, 2015); Waller v. City of Middletown, No. 3:11-CV-01322, 2014 WL 4843681, at *15 (D. Conn. Sept. 29, 2014), order vacated in part on other grounds on reconsideration, No. 3:11-CV-01322, 2015 WL 778749 (D. Conn. Feb. 24, 2015).

In any event, the court finds that Mr. Wynne has adduced sufficient evidence to create a triable question as to whether the defendants committed an "egregious violation" of Mr. Lenetis' Fourth Amendment rights to be free from unreasonable search and seizure.  As discussed above, Mr. Wynne has provided evidence that the defendants failed to accommodate Mr. Lenetis' disability and used excessive force,

44

causing Mr. Lenetis' head to collide with the ground with enough force to fatally injure him. Once again, this evidence—viewed in the light most favorable to Mr. Wynne— is sufficient to create a dispute of material fact. Other courts in this District, applying the "egregious violation" standard, have denied summary judgment under somewhat similar circumstances. See, e.g., Anglero v. City of Hartford, No. 3:16-cv-1425, 2020 WL 13250192, at *7 (D. Conn. Feb. 19, 2020) (denying summary judgment where officer tasered and incapacitated plaintiff); see also Bussolari v. City of Hartford, No. 3:14-cv-00149, 2016 WL 4272419, at *2 (D. Conn. Aug. 12, 2016) (denying summary judgment where officers injured plaintiff by repeatedly hitting him and throwing him to the ground).

Because there are material, disputed facts as to whether the underlying conduct was egregious, the court denies defendants' Motion for Summary Judgment as to Count Five.[21]

### 5.    Count Eight: Indemnification

Finally, the defendants argue that Mr. Wynne's claim for indemnification under section 7-465 of the Connecticut General Statutes "fails as a matter of law because

---

[21] The defendants also argue that they cannot be held liable under Article First, section 9 because "[s]ection 9 protects against false arrests", and here, the decedent was not arrested. E. Hartford's Summ. J. Mem. at 38-39. Notably, plaintiff's Opposition does not contest defendants' argument that section 9 does not apply. See Pl.'s Opp. at 35-39; see also Pl.'s Officer Beeman Dep. Tr. at 166:4-166:6 (noting that Mr. Lenetis was not placed under arrest); Pl.'s Officer Clayton Dep. Tr. at 116:22-117:2 (same). As such, the court deems abandoned plaintiff's claimed violation of Article First, section 9. See Marseille v. Mount Sinai Hosp., No. 21-2140, 2022 WL 14700981, at *1 n.1 (2d Cir. Oct. 26, 2022) (summary order) (noting that a district court may deem a claim abandoned, at the summary judgment stage, where a nonmoving party fails to respond to the moving party's argument); accord Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

Regardless, however, the underlying conduct at issue clearly falls within the parameters of Article First, section 7. See Bussolari, 2016 WL 4272419, at *1-2 (analyzing an excessive force claim under section 7). Because the court concludes that there is a genuine issue of material fact as to whether defendants' conduct was egregious enough to violate Article First, section 7, summary judgment as to Count Five is denied.

neither Officer Clayton nor Officer Beeman is liable" for plaintiff's other claims.  E.

Hartford's Summ. J. Mem. at 39.  Because the court has found disputes of material fact

sufficient to defeat summary judgment for each claim against Officer Beeman and

Officer Clayton, defendants' Motion for Summary Judgment as to Count Eight must also

be denied.

> 6.   Conclusion

For the reasons stated above, the defendants' Motion for Summary Judgment

(Doc. No. 159) is denied.

> B.   Plaintiff and Apportionment Defendants' Motions for Summary Judgment
> (Doc. Nos. 141, 147, 148)

The apportionment defendants— Mr. Zetterstrom, Ms. Vest, the Ambulance

Service, and Saint Francis—as well as Mr. Wynne,[22] have moved for summary

judgment on each of the apportionment claims of Officer Beeman, Officer Clayton, and

the Town of East Hartford.[23]  See Wynne's Mot. for Summ. J.; Ambulance Serv.'s Mot.

for Summ. J.; St. Francis' Mot. for Summ. J.  Mr. Wynne and the apportionment

defendants argue that the Town and the officers—the "apportionment plaintiffs" in this

matter—cannot establish causation because they have failed to provide expert

---

[22] Lower Connecticut courts have held that plaintiffs have standing to challenge an apportionment complaint in which they are not a named party.  See, e.g., Sheehan v. Donkor, No. CV020513224S, 2003 WL 294358, at *1 n.1 (Jan. 6, 2003); Garcia v. Alija, No. FBTCV146043161, 2015 WL 544910, at *3-4 (Jan. 15, 2015).  Connecticut courts have emphasized that "[t]he existence of an apportionment defendant has a potentially significant impact on the plaintiff's right and ability to satisfy a judgment." Garcia, 2015 WL 544910, at *3 (quoting Bialik v. Vill of Brookfield Commons Ltd., No. CV020346730S, 2003 WL 22133908, at *2 (Aug. 26, 2003)).  For that same reason, the court finds that, in challenging the apportionment claims, plaintiff satisfies the requirements of Article III standing.  The court further notes that the apportionment defendants, who undoubtedly have standing, have also moved for summary judgment against the Town and officers' apportionment claims.  See Ambulance Serv.'s Mot. for Summ. J.; St. Francis' Mot. for Summ. J.

[23] The court will refer to the Town of East Hartford, Officer Beeman, and Officer Clayton as "the apportionment plaintiffs" throughout Section IV.B.

testimony showing that the apportionment defendants' negligence caused Mr. Lenetis' death.

To prevail in a medical malpractice action, the plaintiff must establish (1) the requisite standard of care, (2) deviation from that standard, and (3) causal connection between the deviation and the claimed injury.  Procaccini v. Lawrence & Memorial Hosp., Inc., 175 Conn. App. 692, 717-18 (2017).  As discussed above, to establish causation, the plaintiff must show that the defendant's negligence was both a cause in fact and the proximate cause of the decedent's injuries and death. See Boone v. Williams W. Backus Hosp., 272 Conn. 551, 567 (2005).  Moreover, because the apportionment plaintiffs are asserting a "lost chance" claim, i.e., a claim that the apportionment defendants failed to timely and adequately render medical treatment for a preexisting injury, they must also show that (1) the decedent was deprived of a chance for successful treatment, and (2) that this decreased chance more likely than not resulted from the defendant's negligence.  Id. at 573-74.  To prevail in a "lost chance" claim, the plaintiff must prove that the decedent had a greater than even chance of survival prior to the decedent's alleged negligence.  Id. at 574.

Generally, Connecticut courts require the plaintiff to provide expert testimony to establish each of these elements of medical negligence, including causation.  Id. at 718; accord Mendez v. Roman, No. 3:05-CV-1257, 2006 WL 8448197, at *2 (D. Conn. Mar. 2, 2006) ("[T]o withstand a properly supported motion for summary judgment filed by an apportionment defendant . . . [the] defendant . . . must produce expert evidence that the apportionment defendant caused the plaintiff's injuries.").  However, there are "three exceptions" to the expert opinion requirement: an expert opinion need not be proffered

47

when (1) "the negligence is gross"; (2) "the medical condition is obvious"; or (3) "when the plaintiff's evidence of injury creates a probability so strong that a lay juror can form a reasonable belief."  Poulin v. Yasner, 64 Conn. App. 730, 747 (2001).

        1.     Gross or Obvious Negligence

As a threshold matter, the apportionment plaintiffs argue that they need not provide expert testimony as to causation because "the record evidence raises genuine issues of disputed material facts as to whether the apportionment defendants' negligence was gross and/or whether the decedent's medical condition was obvious." E. Hartford's Apportionment Opp. at 8.

To meet the standard for "gross negligence", the medical negligence must be "so gross as to be clear even to a lay person."  Kalams v. Giacchetto, 268 Conn. 244, 248 n.4 (2004).  There must be "such gross want of care or skill as to afford, of itself, an almost conclusive inference of negligence that the testimony of an expert is not necessary."  Puro v. Henry, 188 Conn. 301, 305 (1982).  In sum, a plaintiff must provide "evidence from which a lay jury could conclude, on the basis of its own common knowledge, that the defendant's conduct constituted an obvious and egregious violation of an established standard of care and that this violation proximately caused the decedent's injuries and death."  See Boone, 272 Conn. at 568-69.

With respect to the EMTs and the Ambulance Service, the apportionment plaintiffs contend that Mr. Zetterstrom's failure to "check[ ] the decedent's pupils upon leaving the scene", as well as his failure to "perform[ ] [a] neurological assessment of

48

the decedent", "amounts to a gross lack of care conclusive of negligence".[24]  E.

Hartford's Apportionment Opp. at 8.

The defendants have provided a Report by Gary Ludwig, a paramedic, finding

that the EMTs "grossly deviated from the standard of care with respect to the treatment

and transport of Mr. Lenetis when they failed to properly conduct an examination of his

head, pupils and blood pressure."  See Ludwig Report at 8.  Mr. Ludwig cites to an

underlying Patient Care Report from the EMTs that, according to him, lacked

documentation as to whether the EMTs checked Lenetis' pupils, blood pressure, or

head.  Id. at 6-7.  According to Mr. Ludwig, the "supposition within the EMS profession,

as well as the medical profession in general is, if it was not written down, it was not

done."[25]  Id. at 6.  In his deposition, Mr. Zetterstrom testified that he checked Mr.

Lenetis' pupils once.  See Defs.'/Apportionment Pls.' Zetterstrom Dep. Tr. at 105:3-

105:10.  The deposition transcript excerpts proffered by the parties do not appear to

address whether Mr. Zetterstrom checked Mr. Lenetis' blood pressure.  Mr. Zetterstrom

also appears to admit, in his deposition, that he did not perform a neurological exam on

Mr. Lenetis during the ambulance ride.  See id. at 70:5-70:8.

However, even construing the evidence in a light most favorable to the

apportionment plaintiffs, and accepting all the factual assertions in the Ludwig Report as

---

[24] The apportionment plaintiffs also appear to cite testimony from Ms. Vest that Mr. Lenetis was "unconscious when delivered to the west wing" as evidence that the EMTs were grossly negligent.  E. Hartford's Apportionment Opp. at 9; accord Defs.'/Apportionment Pls.' Vest Dep. Tr. at 24:14-24:23 (testifying that Mr. Lenetis was "passed out" when he was moved from the ambulance to the hospital). The apportionment plaintiffs do not, however, explain why Ms. Vest's recollection that Mr. Lenetis was unconscious upon his arrival creates an inference of gross negligence.  As such, it does not alter this court's analysis as to whether the EMTs were grossly negligent.

[25] As noted above, the court could not locate, in the available record, the EMT Patient Care Report that Mr. Ludwig references.  See note 7, supra.

true, the court cannot agree that this evidence is sufficient to raise a triable issue of fact as to <u>gross</u> negligence, such that expert testimony as to causation is unnecessary.  The Connecticut Supreme Court has noted that the exception is generally reserved for particularly egregious and clear cases, such as foreign objects discovered in the body or abnormal injuries incurred during surgery.  <u>Boone</u>, 272 Conn. at 567.  The time and manner of evaluating an individual with a subdural hematoma, on the other hand, are "not within the common knowledge of laypersons."  <u>Id.</u>  As such, the alleged failure by the EMTs to check the decedent's pupils or to conduct a neurological assessment are not "so gross as to be clear to even a lay person."  <u>Id.</u> (citing <u>Kalams</u>, 268 Conn. at 248 n.4).  Given the nature of Mr. Lenetis' condition, expert testimony is necessary to establish, to a lay jury, how the asserted failures by the apportionment defendants to adequately and timely assess Mr. Lenetis' subdural hematoma condition in the ambulance caused his death.  <u>See</u> <u>Sherman v. Bristol Hosp.</u>, 79 Conn. App. 78, 89-90 (2003) (finding that expert testimony was necessary to establish frequency with which defendant should have monitored decedent after giving him morphine, despite his cardiac and obesity issues); <u>see also</u> <u>Boone</u>, 272 Conn. at 569 (holding that "[e]xpert testimony was necessary . . . to establish when, and in what manner, it is safe to administer Rocephin to a patient with a penicillin allergy").

The apportionment plaintiffs similarly argue that there is a dispute of material fact as to whether Saint Francis' alleged failure to timely diagnose, treat, and perform surgery on Mr. Lenetis constitutes gross negligence.  E. Hartford's Apportionment Opp. at 8.  Once again, the court finds that the underlying evidence, even construed in a light most favorable to the apportionment plaintiffs, is insufficient to meet the standard of

gross negligence.  It is not clear, just from the circumstantial evidence proffered by the apportionment plaintiffs, that the delayed treatment constituted a gross deviation from the standard of care that, in turn, helped cause Mr. Lenetis' death.  Indeed, the types of conditions and situations found by Connecticut courts to satisfy the gross negligence standard are strikingly different from the situation in the case at bar.  See, e.g., Puro, 188 Conn. at 305 (finding that a needle left in patient's abdominal wall was sufficient to stablish gross negligence); Poulin, 64 Conn. App. at 748 (noting that "[c]ircumstantial evidence was sufficient in Puro to conclude that the defendants left a needle in the plaintiff's abdominal wall during surgery, and that the needle caused the plaintiff pain and suffering that necessitated further surgery" (citing Puro, 188 Conn. at 305)); Console v. Nickou, 156 Conn. 268, 274-75 (1968) (finding that circumstantial evidence of physician leaving needle in patient during childbirth was sufficient to establish gross negligence).

Here, the question of whether Mr. Lenetis could have survived his subdural hematoma condition, had treatment been rendered earlier, is not "within the ken of a lay person."  See Law v. Camp, 116 F. Supp. 2d 295, 305-06 (D. Conn. 2000) (finding that the determination of whether a decedent "could have survived . . . severe anoxic ischemic insult and . . . cardiorespiratory arrest" is "not one of the rare cases where causation is within the ken of a lay person"); accord Dimmock v. Lawrence & Mem'l Hosp., Inc., 286 Conn. 789, 811-14 (2008) (concluding that plaintiff's allegation that the defendants failed to properly treat her post-surgery infection was insufficient to meet the gross negligence standard).  In sum, the alleged negligence in this case is insufficient, under existing Connecticut case law, to meet the high threshold of gross negligence.

The court finds the apportionment plaintiffs' arguments as to obviousness to be similarly unavailing.  The apportionment plaintiffs assert that "conflicting testimony and evidence . . . concerning bruising to the decedent's left eye area, his agitation and confusion, aggression, and/or his lack of consciousness or responsiveness" create a triable question of fact as to whether his condition was obvious.  E. Hartford's Apportionment Opp. at 10.  Subdural hematomas are not "obvious or simple matters of everyday life", State v. Orsini, 155 Conn. 367, 372 (1967), and the evidence cited by the apportionment plaintiffs is plainly insufficient to show that Mr. Lenetis' subdural hematoma condition was obvious.

As such, the court cannot conclude, under the proffered evidence, that there is a genuine issue of material fact as to the gross negligence or obviousness exceptions to expert testimony.  Thus, to survive summary judgment, the apportionment plaintiffs must provide expert testimony.

        2.    Expert Testimony

The apportionment plaintiffs have provided reports from three experts: Gary Vilke ("Dr. Vilke"), an emergency department physician, see Vilke Report, Pl.'s Ex. 18 (Doc. No. 141-21); Gary Ludwig ("Mr. Ludwig"), a paramedic, see Ludwig Report; and Gavin Britz ("Dr. Britz"), a neurosurgeon, see Britz Report, Pl.'s Ex. 20 (Doc. No. 141-23).  Mr. Ludwig's Report concludes that the EMTs and the Ambulance Service deviated from the applicable standard of care when treating Mr. Lenetis, see Ludwig Report at 7, and Dr. Vilke's Report concludes the same with respect to Saint Francis and its staff, see Vilke Report at 4.  However, neither Mr. Ludwig's nor Dr. Vilke's Reports opine on causation. Dr. Britz's Report describes the extent of Mr. Lenetis' head injury and the treatment he

received, and it notes that (1) had Mr. Lenetis obtained an earlier "CT scan" at Saint

Francis, his "coagulation profile could have been corrected[,] platelets [could have been]

given[,] and he could have undergone surgery", which "may have resulted in a different

outcome but may not have", <u>see</u> Britz Report at 7; and (2) "[i]n an ideal world an earlier

diagnosis would have allowed a surgeon to be called, the platelets given and

coagulation corrected that may have changed the outcome", <u>id.</u> at 8.  The Town and

officers have also provided testimony from Dr. Kolb—the neurosurgeon at Saint Francis

who performed emergency neurosurgery on Mr. Lenetis—that, "in theory", had Mr.

Lenetis been conscious when he arrived at the hospital, and had he obtained a CT scan

upon his arrival, his outcome "most likely would have been better", <u>see</u> Dr. Luis Kolb's

March 14, 2022 Deposition Transcript ("Defs.' Kolb Dep. Tr."), Defs.'/Apportionment

Pls.' Ex. F, at 31:4-31:7.

Mr. Wynne and the apportionment defendants do not contest that the

apportionment plaintiffs' expert testimony meets the first two requirements for showing

medical malpractice.  However, they argue that summary judgment is warranted

because the expert testimony does not sufficiently address causation.  <u>See</u> Plaintiff

Wynne's Memorandum of Law in Support of Motion for Summary Judgment ("Wynne's

Summ. J. Mem."), at 13 (Doc. No. 141-21).  The apportionment plaintiffs respond that

the expert testimony raises issues of material fact as to causation sufficient to defeat

summary judgment.  <u>See</u> E. Hartford's Apportionment Opp. at 11.  Because the Town

and officers allege different theories of negligence—one applicable to the Ambulance

Service and the EMTs, and the other applicable to Saint Francis—the court must

analyze the issue of causation separately as to each set of apportionment defendants.

a)      Counts One and Two: Mr. Zetterstrom, Ms. Vest, and the
        Ambulance Service

In their Supplemental Memorandum, Mr. Zetterstrom, Ms. Vest, and the

Ambulance Service assert that the apportionment plaintiffs have provided no expert

testimony that their negligence caused Mr. Lenetis' death.  <u>See</u> Memorandum of Law in

Support of the Ambulance Service's Motion for Summary Judgment, at 9 (Doc. No. 148-

1).  Indeed, the court cannot locate—and the apportionment plaintiffs have not cited—

any opinion, from any expert, that states that the alleged negligence of the EMTs and

the Ambulance Service caused Mr. Lenetis' death.  Although Mr. Ludwig's Report

concludes that the EMTs and the Ambulance Service violated applicable standards of

care, it does not address causation.[26]  Moreover, while Dr. Britz's Report opines that an

earlier CT scan and earlier treatment "may have" or "may not have" changed Mr.

Lenetis' outcome, <u>see</u> Britz Report at 7-8, neither delay is attributable to the EMTs or

the Ambulance Service, who were not involved in deciding when to perform a CT scan

and when to perform surgery.[27]  Dr. Kolb's testimony that an earlier CT scan could have

improved Mr. Lenetis' outcome similarly deals with decisions made by Saint Francis

hospital staff, and not the EMTs or Ambulance Service.  Simply put, the alleged

deviations of the standard of care by the EMTs, <u>i.e.</u>, their asserted failure to check Mr.

Lenetis' pupils, blood pressure, and head, are far too attenuated from either of the two

potential theories of causation offered by Dr. Britz and Dr. Kolb.  Because the

---

[26] Mr. Wynne also notes—and the apportionment plaintiffs do not contest—that Mr. Ludwig is not
qualified to testify as to causation in this matter because he lacks a background in neurology.  <u>See</u>
Wynne's Summ. J. Mem. at 9-10.

[27] In addition, "may have" or "may not have" merely establishes possibility, rather than probability,
and it does not meet the "more likely than not" standard required for establishing a "lost chance" claim.
<u>See</u> Section IV.B.2.b, <u>infra</u>.

apportionments plaintiffs can point to no expert opinion that the EMTs and the Ambulance Service caused Mr. Lenetis' death, their apportionment claims against both EMTs and the Ambulance Service fail as a matter of law.

The court therefore grants the Ambulance Service's Motion for Summary Judgment and grants Mr. Wynne's Motion for Summary Judgment as to Counts One and Two of the Apportionment Complaint.

<blockquote>b)     Count Three: Saint Francis</blockquote>

Mr. Wynne and the apportionment defendants argue that the expert testimony with respect to Saint Francis similarly fails to meet the requirements for showing causation.  See Wynne's Summ. J. Mem. at 13; St. Francis' Mot. for Summ. J.  The apportionment plaintiffs, however, point to Dr. Britz's testimony that an earlier CT scan and earlier treatment from hospital staff "may have" or "may not have" changed Mr. Lenetis' outcome, which, they contend, is sufficient to defeat summary judgment.  See E. Hartford's Apportionment Opp. at 14-15.  They also cite the deposition testimony from Dr. Kolb that, "in theory", had Mr. Lenetis been conscious when he arrived at the hospital,[28] and had he obtained a CT scan upon his arrival, his outcome "most likely would have been better", see Defs.' Kolb Dep. Tr. at 31:4-31:7.

As a threshold matter, the court notes that, when considering a motion for summary judgment, a district court is "under no obligation to engage in an exhaustive search of the record."  Jones v. Goord, 435 F. Supp. 2d 221, 259 (S.D.N.Y. 2006).

---

[28] As the apportionment plaintiffs correctly note, there is evidence in the record that Mr. Lenetis may have been conscious for at least some period of time upon his admission to the hospital.  See E. Hartford's Apportionment Opp. at 9; accord Louis William Witkowski April 28, 2022 Deposition Transcript, Defs.'/Apportionment Pls.' Ex. K, at 40:8-40:11 (Doc. No. 156-12).

Nonetheless, in the case at bar, the court has closely scrutinized the underlying record for expert testimony and other evidence of causation, beyond the materials cited in the apportionment plaintiffs' moving papers.

Under Connecticut law, "to prove his or her entitlement to recovery, [a plaintiff] must demonstrate [a] lost chance in terms of probability, not possibility." Drew v. William W. Backus Hosp., 77 Conn. App. 645, 655 (2003).  Here, the court finds—after a close and diligent view of the record and drawing all inferences in favor of the nonmoving parties—that the apportionment plaintiffs have not provided expert testimony sufficient to clear this legal hurdle.  Dr. Britz's testimony that an earlier CT scan "may have" or "may not have" changed Mr. Lenetis' outcome fails to establish that Mr. Lenetis had even a substantial, let alone greater than even, chance of survival at the time of his arrival to the hospital.  Dr. Britz's statement that, "[i]n an ideal world an earlier diagnosis would have allowed a surgeon to be called, the platelets given and coagulation corrected that may have changed the outcome", see Britz Report at 8, is similarly unavailing.  Dr. Britz's vague assertions, even construed in a light most favorable to the apportionment plaintiffs, are clearly stated in terms of possibility, rather than probability, and do not suffice to establish causal connection between Saint Francis' alleged negligence and Mr. Lenetis' death, as required by Connecticut law.

The excerpt of Dr. Kolb's testimony offered by the apportionment plaintiffs that, "in theory, if [Mr. Lenetis] was talking and he got a CAT scan and this large subdural was seen then, he was taken to the OR then, his outcome would most likely have been

better", <u>see</u> Defs.' Kolb Dep. Tr. at 31:4-31:7, also falls short.[29]  First, the statement—namely, the problematic use of the phrase "in theory"—is stated in terms of possibility, rather than probability, which is insufficient to establish causation under the "lost chance" theory.  <u>See</u> <u>Drew</u>, 77 Conn. App. at 655 (noting that a "lost chance" theory must be stated in probabilistic terms).  Moreover, the use of the phrase "most likely would have been better", while potentially indicative of Mr. Lenetis having a greater than even chance of survival when read in a light most favorable to the apportionment plaintiffs, is also vague and imprecise.

Second, after a close review of the other proffered excerpts of Dr. Kolb's testimony, it is clear that the statement cited by the apportionment plaintiffs is undermined by other parts of Mr. Kolb's testimony.  <u>See, e.g.</u>, Defs.' Kolb Dep. Tr. at 78:4-78:9 (testimony from Dr. Kolb that, "had [he] known [Mr. Lenetis'] platelets were low . . . even if [Mr. Lenetis'] CAT scan was an hour or two before . . . [he] would not have taken [Mr. Lenetis] to surgery"); <u>id.</u> at 20:4-20:8 (noting that low blood platelets act as a complicating factor for the surgery Mr. Lenetis needed); Dr. Luis Kolb's March 14, 2022 Deposition Transcript, Pl.'s Ex. 12, at 54:3-54:7 (Doc. No. 141-15) (testifying that "most patients [with Mr. Lenetis' injury] don't make it").  "Whether an expert's testimony is expressed in terms of a reasonable probability . . . is determined by looking at the entire substance of the expert's testimony."  <u>Struckman v. Burns</u>, 205 Conn. 542, 554-55 (1987).  Here, the overarching substance of Dr. Kolb's testimony does not suggest

---

[29] The apportionment plaintiffs have not provided an expert report by Dr. Kolb; rather, they largely rely on this single response to a question at his deposition.  The court thus notes at the outset that, without a report that conforms with Rule 26 of the Federal Rules of Civil Procedure, it is difficult to discern whether Dr. Kolb's opinion is based on a reasonable degree of medical certainty and to identify the specific assumed facts on which the opinion is based.

that, in his expert opinion, Mr. Lenetis had a greater than even chance of surviving, and that this chance was decreased by Saint Francis' alleged negligence.

Third, Dr. Kolb's statement does not connect the specific violation of the standard of care alleged by the apportionment plaintiffs to Mr. Lenetis' death.  In his Report, Dr. Vilke opines that "[f]ailure [by Saint Francis staff] to screen or triage Mr. Lenetis to the emergency department for further evaluation deviated from the standard of care based on his presentation on November 1, 2019."  Vilke Report at 7.  At no point does Dr. Vilke specifically opine that the delayed CT scan constituted a deviation from the standard of care, and he does not connect the alleged failure to screen or triage Mr. Lenetis to the delayed CT scan.  As such, the testimony does not establish that the breach identified by the apportionment plaintiffs "proximately and in fact caused the injuries and death of the decedent", as Connecticut law requires.  See Boone, 272 Conn. at 575.

Taken together, the apportionment plaintiffs' proffered evidence is insufficient to raise a triable issue of material fact as to causation.  See id. at 574 (granting summary judgment where "plaintiff failed to present any evidence" that the decedent (1) had "at least a 51 percent chance of survival", (2) "the decedent had a decreased chance of successful treatment", and (3) "this decreased chance more likely than not resulted from the defendant's negligent failure to treat . . . the decedent").  As noted above, the court thoroughly searched the underlying record, closely reviewing, in particular, every portion of the proffered testimony from Dr. Kolb and the expert reports provided by the apportionment plaintiffs.  For the reasons discussed above, the court concludes that there is an insufficient basis in the record before the court on which a reasonable jury

could find that Saint Francis' alleged medical negligence caused, under the "lost chance" theory, Mr. Lenetis' death.[30]

Thus, the court grants Saint Francis' Motion for Summary Judgment; Mr. Wynne's Motion for Summary Judgment is also granted as to Count Three of the Apportionment Complaint.

C.      Motion to Preclude Expert Testimony (Doc. No. 153)

The Town and the officers[31] have moved to preclude the testimony of plaintiff's expert witnesses, Ms. Flaherty and Mr. Clark, arguing that both witnesses are unqualified and that their testimony is unreliable and irrelevant.  See E. Hartford's Mot. to Preclude Experts.

1.      Testimony of Kathleen Flaherty

a)      Qualifications

In her expert testimony, Ms. Flaherty opines as to whether the defendant officers reasonably accommodated Mr. Lenetis' disability.  See Kathleen M. Flaherty Expert

---

[30] The apportionment plaintiffs also argue that, "in the event [they] prevail on their Motion for Summary Judgment as to the plaintiff's federal claims", the court should allow Connecticut courts to resolve the "important issues of state law" in this case—namely, whether to adopt the "'substantial chance' approach to the loss of chance doctrine rather than adhering to the traditional [more likely than not] approach adopted by Connecticut courts thus far in applying the doctrine."  See E. Hartford Apportionment Opp. at 15-16.  Under the substantial chance approach, a plaintiff would only need to show that a substantial or significant chance of survival was lost.  See Peterson v. Ocean Radiology Assocs., 109 Conn. App. 275, 277-78 n.1 (2008).

As a threshold matter, the Town and officers' request is moot because the court has denied their Motion for Summary Judgment as to each of Mr. Wynne's federal claims.  Moreover, the Connecticut Supreme Court has made clear that, under Connecticut law, establishing a "lost chance" claim requires plaintiffs to prove that the decedent had a greater than even chance of survival, rather than just a "substantial" or "significant" chance of survival.  See Boone, 272 Conn. at 573-74.  This court is obligated to follow controlling Connecticut law; as such, it must apply the traditional approach, as the Connecticut Supreme Court has instructed.

[31] The court will refer to the Town of East Hartford, Officer Beeman, and Officer Clayton as "the defendants" throughout Section IV.C.

Report ("Flaherty Report"), Plaintiff's Disclosure of Experts, Defs.' Ex. C, at 11 (Doc. No. 153-3).[32]  The defendants contend that Ms. Flaherty is unqualified to testify on the defendants' conduct because she lacks POSTC certification and lacks knowledge about the law enforcement training received by the defendant officers.  See Defendants/Apportionment Plaintiffs' Memorandum of Law in Support of Daubert Motion to Preclude Expert Testimony ("E. Hartford's Preclusion Mem."), at 10 (Doc. No. 153-1).  However, the Second Circuit has emphasized that "[d]isputes as to the strength of [a witness'] credentials . . . go to the weight, not the admissibility, of [their] testimony."  See McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995).  According to Ms. Flaherty's curriculum vitae ("CV"), she has significant experience in disability rights, having served as the Executive Director for the Connecticut Legal Rights Project since 2015 and, formerly, as a trainer for the National Alliance on Mental Illness from 1999 to 2014, where she offered trainings on de-escalation techniques for individuals in mental health crises.  See Flaherty Report; Flaherty Curriculum Vitae, Plaintiff's Disclosure of Experts, at 28.  Given her experience in the provision of disability accommodations, including accommodations by governmental entities, the court finds that Ms. Flaherty is sufficiently qualified to offer her expert testimony.

b)  Reliability

The defendants argue that Ms. Flaherty's testimony is unreliable because it is (1) unsupported by the record and (2) based upon her "speculative" finding that the defendants had the opportunity to accommodate Mr. Lenetis and that Mr. Lenetis would

---

[32] Because the plaintiff's expert disclosures and accompanying Reports are compiled into one Exhibit, with inconsistent pagination, the court will cite to the CMECF page numbers of the Exhibit for both Ms. Flaherty's and Mr. Clark's Reports.

have lived had the officers accommodated his disability.[33]  E. Hartford's Preclusion

Mem. at 11-12.  The Second Circuit has emphasized that, "[a]lthough expert opinion

should be excluded if it is speculative or conjectural . . . other contentions that the

assumptions are unfounded" go to weight, rather than admissibility.  See Boucher v.

U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).  Here, Ms. Flaherty clearly

bases her analysis and findings on evidence in the record, including the officers'

testimony and General Order 185.00, see Flaherty Report at 11.  Ms. Flaherty's

testimony, as a whole, is not based on speculation, and to the extent she is making any

unfounded assumptions, such assumptions can be addressed via rigorous cross

examination and the presentation of contrary evidence.  See Daubert, 509 U.S. at 596.

The court, thus, finds that Ms. Flaherty's testimony is sufficiently reliable, so long as

plaintiff submits a revised expert disclosure that conforms with Rule 26, as discussed

below.  See Section IV.C.1.c, infra.

c)      Relevance

The defendants further argue that Ms. Flaherty's Report lacks relevance because

it contains impermissible credibility assessments and legal conclusions, and they move

in limine to strike her report on that basis.  See E. Hartford's Preclusion Mem. at 12-17.

First, the defendants contend that Ms. Flaherty "disregard[ed] the undisputed testimony

of the officers and InterCommunity staff members that it was believed by witnesses who

observed Lenetis' aggressive behavior that he was armed and presented an imminent

---

[33] Although the court finds that Ms. Flaherty's opinion, as a whole, is not based on speculation, it agrees with the defendants that several of the statements in her Report that Mr. Lenetis would have lived had he received reasonable accommodations impermissibly intrudes on the factfinding province of the jury, and also exceeds Ms. Flaherty's qualifications because it requires some degree of medical expertise, which she does not possess.  See Section IV.C.1.c, infra.

risk of harm to himself and others . . . ."  Id. at 13.  The court disagrees.  Although Ms.

Flaherty states that, by the time of the encounter, Mr. Lenetis "had already returned to

his apartment" and "was no longer interacting with anyone or anything", see Flaherty

Report at 22, this finding is based on her analysis of the available evidence in the

record—including disputed facts—which is permissible as a basis for her opinion.  At no

point does Ms. Flaherty offer any assessment of the credibility of either the

InterCommunity staff members or the officers.

However, while the court finds that Ms. Flaherty's expert opinion is, as a whole,

relevant and admissible, the court agrees with the defendants that there are multiple

instances within the Report where Ms. Flaherty impermissibly offers legal conclusions,

and that these conclusions should be excluded.  As a threshold matter, the court notes

that the Report is written in narrative form, and neither the disclosure nor the Report

clearly articulate each of Ms. Flaherty's expert opinions and the bases for those

opinions, as required by Rule 26.  The plaintiff's Rule 26 disclosure states that "Ms.

Flaherty's opinions and the basis and reasons for them are contained in her report", see

Plaintiff's Disclosure of Experts at 5, but the Report itself does not clearly delineate each

of Ms. Flaherty's expert opinions.  As such, the disclosure and Report as written do not

sufficiently comply with Rule 26, making it difficult for the court to specifically judge all

the statements in the Report.  Nonetheless, the court finds that many of the statements

and opinions offered in the Report are admissible.  For example, Ms. Flaherty's opinions

on the ways in which the officers could have, and allegedly failed to, accommodate Mr.

Lenetis' disability are admissible.  See, e.g., Flaherty Report at 22 ("Had the officers

changed their practice and procedures that prioritize quick resolution of incidents . . .

they might have taken a few extra minutes to wait for their sergeant to arrive on scene."); id. at 22-23 (noting various potential accommodations the officers "should have", but did not, make).

Other statements in the Report, however, constitute, in this court's view, impermissible legal conclusions or speculation.  Specifically, in her Report, Ms. Flaherty concludes that, "[h]ad the officers accommodated Mr. Lenetis' disability by simply waiting for their sergeant to arrive on the scene, the use of force would likely have been avoided."  Id. at 15.  This conclusion "impermissibly substitutes [Ms. Flaherty's] expert opinion for the factfinding function of the jury" and must be excluded.[34]  See Felix, 2020 WL 6048153, at *7.  Ms. Flaherty's assertions that "the officers ignored [General Order 185.00's] guidance without justification", id. at 17 (emphasis added); that the officers' "failure . . . to provide [Mr. Lenetis] reasonable accommodations . . . result[ed] in the unnecessary use of force", id.; and that the defendants' "failure to [use CIT-trained officers] resulted in a tragic outcome", id. at 21, also either constitute impermissible legal conclusions or invade on the factfinding province of the jury and therefore should be excluded.  See Hygh v. Jacobs, 961 F.2d 359, 362 (2d Cir. 1992) (holding that an expert's conclusion that police force was not "justified under the circumstances" constituted an impermissible legal conclusion); accord Felix, 2020 WL 6048153, at *7 (holding that a conclusion as to whether force was justified impermissibly communicates a legal standard and must be excluded).  Finally, the court agrees with the defendants

---

[34] Indeed, the court notes that the question on which the plaintiff has asked Ms. Flaherty to opine—whether the use of force would have been "avoided" had the officers accommodated Mr. Lenetis—compels Ms. Flaherty to invade the fact-finding province of the jury, and is, therefore, not appropriate.  See Flaherty Report at 11.

that Ms. Flaherty's statements that, "[i]f the responding officers had followed the [EHPD] policy and acted according to nationally recognized best practices, it is likely that [Mr.] Lenetis would still be alive", <u>see</u> Flaherty Report at 23, impermissibly encroaches on the fact-finding province of the jury and exceeds Ms. Flaherty's qualifications by requiring some degree of medical expertise, and therefore must be excluded.  <u>See Felix</u>, 2020 WL 6048153, at *7 (excluding expert testimony that a decedent "would have been alive and treated for his schizophrenic symptoms" if the police officers in his case had received proper training because it improperly encroached on the factfinding function of the jury).

The court therefore grants in part and denies in part the defendants' Motion to Preclude Ms. Flaherty's testimony.  Ms. Flaherty may testify on her knowledge of reasonable accommodations in the law enforcement context, the reasonable accommodations that the officers could have provided to Mr. Lenetis, and the officers' alleged failure to provide such accommodations.  Ms. Flaherty may not testify as to whether the defendant officers' conduct was justified or necessary under the circumstances, and she may not testify as to the ultimate cause of Mr. Lenetis' death.[35]

    2.    Testimony of Roger Clark

        a)    Qualifications

In his expert testimony, Mr. Clark opines on whether the defendants adequately complied with generally accepted law enforcement practices and the EHPD's own policies and procedures.  <u>See</u> Roger Clark Report ("Clark Report"), Plaintiff's Disclosure

---

[35] The court expects that plaintiff will provide opposing counsel, within thirty days, a list of proffered opinions, identifying the bases for each in compliance with Rule 26, and not rely on a narrative report as his Rule 26 disclosure.  Failure to do so may result in this court barring Ms. Flaherty's testimony.

of Experts, at 32.  The defendants argue that Mr. Clark, like Ms. Flaherty, is unqualified

due to his lack of POSTC certification and lack of knowledge as to the defendant

officers' training.

Once again, however, the court finds that the defendants' objections go to the

weight, and not the admissibility, of Mr. Clark's testimony.  According to Mr. Clark's CV,

he served in the Los Angeles County Sheriff's Department for twenty-seven years, is a

graduate of the California Peace Officer Standards and Training ("POST") Command

College, and he has testified on generally accepted police practices and the reasonable

use of force at dozens of trials and depositions across the country.  See Clark Report at

61-62, 70-75.  Courts generally "admit police expert testimony, based solely on the

expert's professional experience, where it is offered to aid the jury's understanding of an

area not within the experience of the average juror."  Cerbelli v. City of New York, No.

99-CV-6846, 2006 WL 2792755, at *8 (E.D.N.Y. Sept. 27, 2006).  Here, Mr. Clark is

testifying as to police practices that are generally outside the realm of knowledge of the

average juror.[36]  The court therefore finds that Mr. Clark is qualified to offer his expert

testimony.

> b)    Reliability

The defendants contend that Mr. Clark's opinions are unreliable because "they

are premised on the facts set forth in the plaintiff's Complaint rather than the factual

---

[36] The defendants also appear to argue that Mr. Clark is unqualified because he partially bases his opinion on video footage of the incident, even though he "has no background or training in forensic video analysis."  E. Hartford's Preclusion Mem. at 6.  The court is perplexed by the argument that reviewing the contents of video footage requires a background in forensics, particularly given the defendants' subsequent argument that Mr. Clark's testimony on the footage should be excluded because it is "information within a factfinder's lay knowledge", as this court would generally agree.  Id. at 15.  In any event, the court disagrees that Mr. Clark is unqualified because he lacks a forensics background.

record along with [unreliable] videos of the incident edited by plaintiff's counsel." E. Hartford's Preclusion Mem. at 12. However, a review of Mr. Clark's Report shows that it did not rely solely on the facts alleged in plaintiff's Complaint; rather, it relied on various materials throughout the factual record, including Officer Beeman and Clayton's testimony. See Clark Report at 33-34, 36-43.

The court is also not persuaded by defendants' argument that Mr. Clarke's testimony should be excluded in part because he partially relied on slowed-down video footage of the incident. The court has already rejected the defendants' argument that the video footage itself should be excluded. Whether Mr. Clark relied on an unreliable version of the footage is an issue that "may affect how much weight the evidence is afforded", but it does not render his testimony inadmissible. See Cabrera, 2018 WL 5276425, at *14. The court therefore finds that Mr. Clark's testimony satisfies the reliability standards of the Federal Rules of Evidence and Daubert.

c)    Relevance

Finally, the defendants seek to exclude Mr. Clark's testimony on the basis that, like Ms. Flaherty, Mr. Clark makes impermissible credibility assessments and legal conclusions. The court disagrees, for the same reasons as it does with respect to Ms. Flaherty, that Mr. Clark's report makes any improper credibility assessments. However, the court agrees with the defendants that many of the statements made in the "Opinions Thus Far" section of Mr. Clark's report, see Clark Report at 59-60, constitute impermissible legal conclusions. In this section, Mr. Clark states that the officers' use of force was excessive, unjustified, unnecessary, or inappropriate; that the officers "failed to treat Mr. Lenetis as a person with a mental disability in violation of . . . the law"; that

66

Mr. Lenetis was "denied his rights . . . under the ADA"; that the officers' actions were "unconstitutional" and "in violation of policy and law"; and that the "EHPD and . . . their chain of command has endorsed the conduct and procedures that resulted in the events that resulted in the treatment inflicted upon Mr. Lenetis."  Id. at 59-61.  Each of these statements impermissibly state a legal standard or otherwise offer legal conclusions that lie in the province of jury.  See Hygh, 961 F.2d at 362; Felix, 2020 WL 6048153, at *7.  As such, they are inadmissible.[37]

The court thus grants in part and denies in part the defendants' Motion to Preclude Mr. Clark's testimony.  Mr. Clark may testify as to his knowledge of generally accepted law enforcement practices and whether the officers adhered to those practices in their encounter with Mr. Lenetis.  Ms. Clark may not testify as to whether the defendant officers' conduct was justified or necessary under the circumstances; nor may he testify as to the ultimate cause of Mr. Lenetis' death or whether the defendant officers' actions were unconstitutional or otherwise illegal.[38]

## V.   CONCLUSION

For the reasons stated above, the defendants' Motion for Summary Judgment (Doc. No. 159) is denied; the Motion for Summary Judgment by the Ambulance Service, Mr. Zetterstrom, and Ms. Vest (Doc. No. 148) is granted; Saint Francis' Motion for

---

[37] The court disagrees, however, with defendants' argument that Mr. Clark's opinions on the contents of the video footage is inadmissible because it is "information within a factfinder's lay knowledge".  E. Hartford's Preclusion Mem. at 15.  Mr. Clark relied in part on the footage in formulating his admissible expert opinion; as such, the court finds that his testimony on the footage is relevant, and therefore admissible.

[38] Again, the court expects that plaintiff will provide opposing counsel, within thirty days, a list of proffered opinions, identifying the bases for each in compliance with Rule 26, and not rely on a narrative report as his Rule 26 disclosure.  Failure to do so may result in this court barring Mr. Clark's testimony.

Summary Judgment (Doc. No. 147) is granted; and Mr. Wynne's Motion for Summary

Judgment (Doc. No. 141) is granted.  The defendants' Motion to Preclude (Doc. No.

153) is granted in part and denied in part.


**SO ORDERED.**

Dated at New Haven, Connecticut this 7th day of November 2023.


　 /s/ Janet C. Hall　　　　　
Janet C. Hall
United States District Judge